## Logan's Estate.

*Will — Probate — Issue devisavit vel non — Presumption — Undue influence.*

The fact that a son of the testatrix, and the principal beneficiary under her will had at one time assisted his mother in making sale of her house, and at the time the will was made was her attorney in fact to collect an inheritance, and that he procured the scrivener who wrote the will, and gave him the data from which it was prepared, raises no presumption against the validity of the will, where it has been duly probated in the usual form. In such a case in the absence of all evidence of physical constraint, fraud, imposition, circumvention and falsehood, nothing short of a mental weakness that left testatrix's will subject to her son's, and made her willing to adopt his for her own, could avail the contestant; and in order to prevail the contestant would be obliged to go further and produce evidence warranting a finding that testatrix's mind had been in point of fact dominated and imprisoned by her son.

Where the charge is that undue influence was exerted upon a mind healthy, strong and free, nothing short of direct proof will avail, and it must be clear and convincing.

The fact that the son of testatrix, who was the principal beneficiary under her will, concealed from his sister, the contestant, the fact of the execution of the will, is not sufficient in itself to justify the court in awarding an issue devisavit vel non, where there is no evidence of mental incapacity to make a will, and there is no evidence of duress or undue inflence on the part of the son.

The fact that testatrix at the time she executed her will was in a condition of drowsiness is immaterial in determining whether an issue should be granted, where it appears that testatrix lived three weeks afterwards, was conscious of the fact that she had executed a will, and with abundant opportunity to express her dissatisfaction, allowed things to remain as they were.

Argued March 5, 1900. Appeal, No. 107, Jan. T., 1899, by Lucretia Crawford, from decree of O. C. Franklin Co., refusing an issue devisavit vel non, in estate of Elizabeth Logan, deceased. Before GREEN, C. J., McCollum, MITCHELL, DEAN, FELL and MESTREZAT, JJ. Affirmed.

Appeal from register of wills.

The facts appear by the opinion of JOHN STEWART, P. J., which was as follows:

This matter comes before us on certificate from the register,

submitting certain questions, difficult and disputable as he certifies, and affecting a certain paper alleged to be the last will of Elizabeth Logan, deceased, against the probate of which a caveat has been entered. These questions we proceed to consider, in the light of the evidence submitted.

In excluding her daughter, Mrs. Crawford, from participation in her estate, the testatrix violated no principle of public policy, religion or morality, nor did she infringe on any statute. Within these limits she could, if of sound and disposing mind and understanding, make any disposition of her property she saw fit: Bainbridge's Appeal, 97 Pa. 482. Still, if upon a review of the whole case, it remains in doubt whether she was possessed of testamentary capacity, or whether undue influence was exerted to procure this particular disposition of her property, the inequality, if grossly unreasonable, and plainly inconsistent with testatrix's duty to her family, is to be considered in connection with the other evidence touching these questions: Herster v. Herster, 122 Pa. 239. The exclusion therefore of Mrs. Crawford, if it is to be considered at all, will concern us later on. Other inquiries must have precedence. And first, what are the burdens resting upon the respective parties with respect to proofs?

The paper offered for probate being manifestly testamentary, all that was required of the one presenting it, was to prove by two witnesses that it was authentic, that they saw testatrix subscribe her name thereto, and that at the time of so doing she was of sound and disposing mind, memory and understanding. This much having been done, the burden was shifted upon the contestant, and the measure of the burden she was bound to assume was, to show by evidence which, in probative force, would warrant a jury in rendering a verdict against the will, either (1) because testatrix when she executed the will was, in consequence of mental weakness, incapable of full and intelligent knowledge of the act she was engaged in, and an intelligent understanding of the disposition she desired to make of her property; or, (2) that influence had been exerted by another which destroyed the free agency of testatrix, and substituted another's will for hers. The fact that John Logan, the preferred legatee and proponent, had at one time assisted testatrix in making sale of her house, and at this very time was

her attorney in fact to collect for her a large inheritance in Missouri, in no wise changed or shifted the burden of proof. Nor did the further fact that he procured the scrivener who wrote the will, and gave him the data from which it was prepared have any such effect. None of these things bore in any way on the question of mental soundness, and from neither nor all combined could arise any presumption of unfairness. Such business relations as he is shown to have had with testatrix gave him no superior knowledge with respect to the matters that entered into the will as placed them upon unequal terms, nor do they show such dependence and trust as to render an overmastering influence or unfair advantage probable, in this particular business. Were John Logan, the proponent, a stranger to the blood of testatrix, his burthen would not only have been greater in the first instance, since then he would have been compelled to show not only the execution of the will, but that testatrix was acquainted with its contents, and had an intelligent consciousness of the proportion of the estate to be taken by him, (Blume v. Hartman, 115 Pa. 37,) but with evidence on the part of contestant of some degree of mental weakness, showing that testatrix was in a condition to be imposed upon, yet short of testamentary incapacity if left uninfluenced, the whole burden would have shifted back upon proponent, and it would have rested with him to show affirmatively the essential requirements of a valid will: Caldwell v. Anderson, 104 Pa. 204. But instead of being a stranger to the blood he was a son of testatrix, and his participation in the making of the will, to the extent heretofore indicated, gives rise to no unfavorable presumption against him, it appearing that the will, after having been prepared by the scrivener and before its execution, was read over to testatrix.

The burden then on the contestant being what we have stated, we are next concerned to know to what extent it was met.

It will hardly be contended that the evidence offered would warrant a jury in setting aside the will on the ground of mental weakness or unsoundness in the testatrix, and it is unnecessary to review the evidence on this branch of the case to show how far short it falls of the purpose. Nor does this evidence show any such mental change or decline as would make the subject abnormally impressionable, whether through fear, affection or

otherwise. It fails to show anything in her condition that would any the more readily expose her to the artifice of designing persons, beyond the decline in her physical strength; and there is not a single fact or circumstance adduced to indicate that she had yielded anything of her natural and accustomed strength of will. That her mental vigor had abated somewhat through age and disease may be conceded, while there is but little in the evidence to show it. She was eighty-five years old, and had already been ill some two weeks when the will was written, and just at that point of time, enfeebled by her previous disorder, was falling victim to the pneumonia that ended her life. The evidence relates chiefly, almost exclusively, to this period of illness, and to conversations with visitors and members of the family. The person who had the largest opportunity of observing the testatrix, is the person who has the largest stake to this controversy, the contestant, and it is in her testimony we may naturally expect to find the facts of largest significance. By far the greatest part of her testimony relates to the altercation between John and herself after the execution of the will, and her own and John's conduct towards their mother and each other, both before and after the date of the will; but we are concerned now with only so much of it as tends to show a condition of mind in the testatrix that made it presumable or probable that John, taking advantage of the situation, dominated her will, and in the testamentary act se scripsit heredem. For in the absence of all evidence of physical constraint, fraud, imposition, circumvention, falsehood, nothing short of a mental weakness that left her will subject to John's, and made her willing to adopt his for her own, can avail the contestant. And this would be but a first step, for, granting an enfeebled condition of mind, but short of testamentary incapacity, since no adverse presumption arises in the case of a son from such circumstances as we have here, as we have already seen, the contestant would be obliged to go further, and offer evidence warranting a finding that testatrix's mind had been in point of fact dominated and imprisoned by John. Now for the evidence. Mrs. Crawford, the contestant, on the stand:

" Q. During those two weeks, what was your mother's mental condition? Did you notice anything? A. Sometimes I

did. Q. Tell us what occurred. A. I would give her her medicine, and in a few minutes after that she would say, 'Cresh, I didn't take my medicine.' I said, 'Yes, mother, you did.' Then after a while she would say to me, 'You better give me that medicine,' and I would say, 'I gave you your medicine awhile ago.' Q. Would she remember that she had taken her medicine? A. No, sir; she would forget in five minutes that she had taken medicine. I would get the bottle and show it to her, and she would say, 'I guess I did.'"

The next circumstance testified to by this witness in this connection relates to a visit from a Mrs. Hovis to her mother. The call was made the next day after testatrix's first illness, when she had fallen on the floor and was found in an unconscious state.

" Q. When she came, who met her? A. I met her and took her into the room. I said, 'Mother, this is Mrs. Hovis.' She took her hand and held her hand all the time she was there. She was in bed. Q. How long did she stay? A. About three quarters of an hour. Q. What conversation passed between your mother and Mrs. Hovis? A. She would ask, 'Are you well Mrs. Hovis?' 'Do you keep well?' I am not positive, but she asked those questions six or seven times. Q. Did your mother say anything else to her on that visit, except to say, 'Are you well?' six or seven times? A. That is all she said. Her and me talked. Q. Did Mrs. Hovis come in again? A. Yes sir. Q. What conversation was there that time? A. She came to the door, I went to the door and she asked me how my mother was. Mother called and said, 'Tell Mrs. Hovis to come in. I want to see her.' They got to talking and she asked her about her father. She said, 'I used to know him when he was at our place, when I was a little girl. Dick Newman is your father.' Mrs. Hovis said, 'No, he is my brother.' She said, 'Yes, I knew your father well. Dick Newman, Dick Newman is your father.' Mrs. Hovis said, 'No, he is my brother.' She came over it a great many times. She came in at dark, and was there about an hour."

We pass over the incident related by the witness in which Mrs. Duck figures in connection with cleaning the wall paper, for the reason that the length of the narrative is out of all proportion to its significance; and though the witness refers to it

as an instance indicating that " her (mother's) mind was fail-
ing," it would be impossible for anybody else to give it any
such importance.   After this narrative she was asked :

" Q. Do you know of any other instances ?  A. Yes, sir.
Q. What other instance ?  A. Yes, sir.  She would tell you
things and she would turn around and say she did not say them.
She would say, ' Cresh give me my medicine,' right after I had
given it to her.  Q. That was in her last sickness?  A. Yes,
sir.  Q. I mean before her last sickness ?  A. Before her last
sickness, I was down there one afternoon.  I cannot tell how
long ago it was.  Q. Some months before her last sickness ?
A. Some weeks.  Yes, sir.  I could notice the things she would
say.  I told mother that I would like to raise eggplants.  She
said, ' I can give you plenty of the seed.'  I said, all right, I will
come down some day and get them.  When I went down for
them she said, ' Eggplant, why I never raised them.  I don't
know anything about them.  I have no seed.'  A great many
things of that kind.  Q. Can you remember anything else ?
A. No, sir, I can't just remember them, but she was like old
ladies, she forgot.  Q. That is the way she seemed, so that her
mind was not as strong as it used to be, that she seemed to
forget things she said ?  A. Yes sir."

We have given all that was said by this witness in her exam-
ination in chief, touching the mental condition of the testatrix ;
all upon which she could base any opinion of her own with
respect to any mental decline.   In her cross-examination no new
facts or incidents were developed.   Mrs. Hovis was called to
testify to the conversations referred to by Mrs. Crawford, and
it is unnecessary to say more with respect to her testimony than
that while it agrees in the main with Mrs. Crawford's, the
details she gives takes away from the testatrix's conduct every
appearance of irrationality or weakness, unless in the sense of
hearing.   The other witnesses who speak to this point are the
two sons of contestant, and they refer to the same matters that
their mother testified to, introducing nothing additional except
the incident in connection with the rabbits.

It is upon this evidence, in connection with the admitted facts
that John Logan, the son and preferred beneficiary, procured
the scrivener who wrote the will, and communicated to the
scrivener the data from which it was to be written, notwith-

standing that before it was executed it was carefully read over to testatrix, item by item, out of the presence of John, that we are asked to say that the presumptions that make for the will have been overcome. We confess an utter inability to see in this evidence anything that indicates a decline in Mrs. Logan's mental faculties beyond what is always incident to old age, and least of all that particular faculty which has to do with the will. Indeed, we think it rarely happens that a charge of mental weakness, earnestly pressed, is so feebly supported by facts. The old lady would forget that she had repeated her dose of medicine at the last stated interval; she made a mistake in the Christian name of Mrs. Hovis's father whom she had once known when a little girl, and repeated it several times after she had been corrected. She asked her visitor a half dozen times during a visit of three quarters of an hour in length, if she was well and her health continued good. She told her daughter that she would give her a certain vegetable seed, and some days after when asked for the seed expressed surprise and said, she had never raised such vegetable. She asked the little boy several times in the same conversation whether his rabbit ate apples. If any of these things shows more than slight mistakes that could easily result from a misunderstanding, or momentary forgetfulness as likely to result from inattention or indifference to the matter spoken about, we fail to see it. Certainly, they would not warrant, in the absence of all support, an inference that one committing such lapses, and who, all her life had been mentally vigorous and self-assertive, had fallen into a state of mental feebleness or dependence. It is not too much to say that in this particular effort, the contestant has failed utterly to show want of testamentary capacity, and has failed equally to show any mental impairment as would make Mrs. Logan a weak and easy subject in the hands of a designing person. This failure is emphasized when we contrast the evidence with that adduced in support of the will. Either the witnesses present at the execution of the will, the three physicians who attended during the last illness, those of her kindred and neighbors who testified on the side of proponent, and who had equal opportunities of observing failed to observe the indications upon which the opposing witnesses based their opinions, or were not at all impressed by them, for they all agree that testatrix was men-

tally sound, and betrayed no sign of weakness. A careful review of the entire evidence in the case leaves us in entire agreement with them on this subject.

It remains then to consider the charge of undue influence as a separate and distinct proposition, and the evidence offered in support of it. On this branch of the case contestant derives no aid from the effort made to show incapacity or mental weakness. Had such weakness been shown, the fact could properly be considered in connection with the present inquiry, and it would have materially lessened the burden on the contestant, by opening a wider door for the admission of evidence. In such case the rule that requires direct evidence would not apply. Where, however, the charge is that undue influence was exerted upon a mind healthy, strong and free, nothing short of direct proof will avail, and it must be clear and convincing: Cuthbertson's Appeal, 97 Pa. 163; Tawney v. Long, 76 Pa. 106.

In the case last cited, GORDON, J., says: " Undue influence to affect a will, must be such as to subjugate the mind of the testator to the will of the person operating upon it. There must be proof of fraud, threats or misrepresentation, undue flattery, or physical or moral coercion, so as to destroy testator's free agency, operating as a present constraint in the making of the will."

We have searched in vain through this record to find some evidence that measures up to this standard. It certainly was not fraud in John Logan to arrange for the execution of the will without the knowledge of his sister, conceding that he attempted so to do, and apart from this one circumstance it does not appear that he attempted concealment of anything. There is not a suggestion of misrepresentation or threat from him, unless we are to derive it from the feeble and insignificant circumstance that he was seen conversing with his invalid mother in whispers the day on which the will was executed. We find an insinuation of physical coercion in the testimony of the daughter and her son, when they both speak of an unusual and unaccounted for drowsiness of the testatrix, about the time of the signing of the will, and which continued until the next morning, but which was observed only by themselves. So slight a basis does it afford for the serious charge that it insinuates, that it does not deserve consideration, but allowing

it to be as stated the fact remains, that with entire freedom to act for herself during the succeeding three weeks of her life, and conscious of the fact that she at least had executed a will—for it is not pretended that her drowsiness overcame her consciousness—and with abundant opportunity to express her dissatisfaction, if she had any, with what had been done, she allowed things to remain as they were, and there is absolutely nothing from which any discontent can be inferred. Certainly so far as this evidence discloses the situation, John Logan stands clear of any attempted fraud or circumvention in the making of this will, and no verdict finding to the contrary could be sustained. His conduct subsequent to the making of the will—and much of the testimony relates to that—would be an important consideration had any fraudulent attempt on his part been shown, but in the absence of such proof it is irrelevant. In what occurred afterwards his conduct towards his sister exposes him to just and severe censure, and while hers is somewhat short of being commendable, that fact in no way excuses him. But all this is aside from the legitimate inquiry.

Such being our conclusion with respect to the evidence offered, it does not concern us to inquire into the disposition the will makes of the estate. We have nothing to do with its wisdom or fairness. It is not our will, but Mrs. Logan's. The estate was hers, and she had a right to do with it as she pleased. She divides her property between her three sons, giving to John some $1,200 more than either of the others, and gives to Mrs. Crawford, an only daughter, but $10.00. Such a disposition may be "contrary to the common sense of the country," but it was made by one having full testamentary capacity, and acting with entire freedom from all undue influence or constraint, and we dare not disturb it.

The case as submitted presents no difficult or disputable question, and it follows that the request for an issue must be refused.

And now, February 6, 1899, after argument and full consideration, the request for an issue is refused, and it is ordered, adjudged and decreed that the register do admit to probate the paper propounded as the last will and testament of Elizabeth Logan, deceased, and it is further ordered that Lucretia Crawford, the caveator, pay the costs of this proceeding.

*Error assigned* was the decree of the court.

*W. Rush Gillan*, with him *D. Watson Rowe*, for appellant, cited on the question of undue influence: Sharpless's Est., 134 Pa. 250; Knauss's App., 114 Pa. 10; Herster v. Herster, 116 Pa. 626; Wilson's App., 99 Pa. 551; Miller's App., 179 Pa. 652; Drake's App., 45 Conn. 9; Yardley v. Cuthbertson, 108 Pa. 395; Yorke's Est., 185 Pa. 70.

*Sharpe*, of *Sharpe & Elder*, for appellees, cited on the burden of proof: Blume v. Hartman, 115 Pa. 32; Eckert v. Flowry, 43 Pa. 46; Thompson v. Kyner, 65 Pa. 368; Tawney v. Long, 76 Pa. 115; Crothers v. Crothers, 149 Pa. 201; Worrall's App., 110 Pa. 49.

Cited on the question of undue influence: Starrett v. Douglass, 2 Yeates, 48; Neel v. Potter, 40 Pa. 483; Fow's Estate, 147 Pa. 264.

PER CURIAM, March 26, 1900:

We are entirely satisfied with the reasons given by the learned court below for refusing an issue in this case and we affirm the decree on the opinion filed.