## Palmer's Estate.

*Wills—Testamentary capacity—Probate—Evidence.*

Testamentary capacity is the normal condition of one of full age, and the affirmative is with him who undertakes to call it in question, and this affirmative he must establish, not in a doubtful, but in a positive manner.

On an application to admit a will to probate, the case turned upon the evidence of the two subscribing witnesses and the attending physician. One of the subscribing witnesses, a justice of the peace, was the scrivener of the will. He testified that the testator dictated it and that he wrote it just as dictated; that in the writing he made a mistake which the testator corrected; that after it was all written he read it over to the testator who said it was correct. He also testified that the testator was rational, and that when he placed the will in his pocket the testator said it was all right. The other subscribing witness testified that the testator signed his name without any assistance, that he seemed to be in a stupid condition, but that she could not tell whether he knew what he was doing. The attending physician testified that the testator was not in fit condition to make a will on the day the paper was executed; but he testified that two days before he himself had filled up two judgment notes for the decedent, and witnessed his execution of them, and at this time the testator was conscious of what he was doing in business matters. The witness also testified that he told the scrivener on the day of the execution of the will that testator's mind was clear at times when he was aroused, but that his mind was torpid when he was left alone; that "occasionally he would be clear; he seemed to be clear while you were speaking. . . . When you would speak to him he would speak up rational." *Held,* that the evidence was not sufficient to justify the refusal to admit will to probate.

Argued Oct. 22, 1907. Appeal, No. 175, Oct. T., 1907, by M. M. Palmer et al., from decree of O. C. Indiana Co., Sept. T., 1906, No. 78, refusing to admit a will to probate in Estate of Joseph Palmer, deceased. Before MITCHELL, C. J., FELL,

BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Reversed.

Appeal from decree affirming decree of register of wills refusing to admit to probate a paper purporting to be the will of Joseph Palmer, deceased.

The facts are stated in the opinion of the Supreme Court.

*Error assigned* was decree refusing to admit the will of the decedent to probate.

*John A. Scott* and *John P. Blair*, with them *Elder Peelor*, for appellants.

*J. N. Banks* and *S. M. Jack*, with them *Samuel Cunningham*, for appellees.

OPINION BY MR. JUSTICE BROWN, January 6, 1908:

This is an appeal from the decree of the orphans' court of Indiana county, affirming the decree of the register of wills refusing to admit to probate a paper purporting to be the last will of Joseph Palmer, deceased. The register's decree was based upon his finding from the testimony produced before him, that the testator did not possess testamentary capacity at the time he executed the will. On the hearing of the appeal undue influence was urged as an additional reason why the probate should be refused, but as to this the court said the evidence offered for the purpose of showing it was insufficient, and the decree was affirmed on the ground of testamentary incapacity alone.

A great mass of testimony was taken before the court on the hearing of the appeal, and, in addition thereto, by agreement of the parties, there was submitted for its consideration that of J. T. Hurd and Dr. R. S. Keeler, taken before the register. The former, called by the proponents, was the scrivener who drew the will and one of the subscribing witnesses to its execution ; the latter, called by the contestants, had been the attending physician of the deceased. It clearly appears from the opinion of the judge of the orphans' court that he sustained the register, not from a consideration of all the testi-

mony produced before him, but from that of Hurd and
Keeler, as to whom he says: " Their evidence is contradict-
ory, and their conclusions are diverse. They are the wit-
nesses who had the best opportunity of knowing what the
mental condition of the testator was at the time of the mak-
ing of the will. In considering their testimony, we cannot
but regard that of Dr. Keeler as the more convincing. He
was the physician, and his judgment as to testator's condi-
tion of mind, all else being equal, ought to be superior. He
was in attendance upon him daily before and after the exe-
cution of the will. He knew the nature of the disease and its
effect upon the mind, the character of the medicines adminis-
tered, and the effect they were intended to and did produce.
The scrivener, on the other hand, saw him but once during his
illness, and then only for the brief time he was writing the pa-
per. Their opportunities to arrive at a correct opinion were
altogether in favor of Dr. Keeler, and we must give his testi-
mony the greater weight. Further, Dr. McHenry testifies
that he attended testator on several occasions between 1895
and 1905, when suffering from suppression of urine, and his
testimony as to the effect which the diseases had upon the
mind corroborates that of Dr. Keeler. There is before us
other evidence bearing upon his condition of intelligence at or
near the time of the writing. Whilst this evidence shows that
there was for brief periods a knowledge of persons, or the
remembrance of facts and circumstances in connection with
his family and estate, yet, there is in our view, nothing to out-
weigh the conclusion we have arrived at from a consideration
of Dr. Keeler's testimony and other testimony strongly cor-
roborative of it." Dr. McHenry's corroboration of Keeler
was in the nature of an answer to a hypothetical question put
to him by the contestants. He had not seen the decedent for
nearly two years before his death. But whether McHenry
corroborated Keeler, or there was other testimony strongly
corroborating him, we do not regard as material, for, from our
examination of his testimony before the register and the court,
we find nothing in it to sustain the contention of the appel-
lees that the testator lacked testamentary capacity. Evidence
strongly corroborative of Hurd was offered, but we shall not
refer to it, for this decree must be reversed on the testimony

of the two witnesses, who, as the court below very properly said, "had the best opportunity of knowing what the mental condition of the testator was at the time of the making of the will."

The testator died September 5, 1906. He was eighty-five years of age. His will was executed August 29, 1906. On that day Hurd, a justice of the peace, in response to a message received the day before that the testator wished to see him, went to his home. The following is taken from his testimony as to what occurred there: "Q. What did you do when you went in? A. I said: 'Good morning; I want to see Mr. Palmer.' He was upstairs in bed. I then went upstairs. I found Mr. Palmer in bed. Q. Did you make any inquiry of him? A. I says, 'Good morning,' and shook hands. 'How are you this morning?' 'Not too bad.' 'What do you want with me?' He says, 'I sent for you to write my will.' Then there was promiscuous conversation. We talked about farming and different things for, I suppose, twenty minutes. Q. Was the will written then? A. No, sir. Q. At that time did you discuss the subject-matter of the will? A. No, sir; not in that conversation. He just said, 'I want you to write my will.' Then we dropped that subject and we talked about other things. Q. Did you remain in the room or leave it after this general talk? A. I stayed in there, I suppose, twenty minutes, a little more or less, maybe; then in came a big man with a satchel I never saw before, and Mrs. Palmer. He got to examining the old man and I got up and went downstairs. Q. Whom did you leave upstairs? A. Mrs. Palmer and this man I took to be a doctor. He proved to be Dr. Keeler of Marion Center. Q. Then Mrs. Palmer and Dr. Keeler were the only persons in the room besides yourself? A. Yes, sir; and Joseph Palmer. Q. What did you do after you went downstairs? A. I went outside of the fence and stood there by myself. Q. State whether or not you had any conversation with anyone there after you were at the fence, or did anyone come to you there? A. I stayed there until Dr. Keeler came downstairs and he came out there. I didn't know his name, but I says, 'What condition is the old man Palmer's mind this morning?' He says, 'All right.' He says, 'What is your business?' I says, 'I play justice of the peace over

here in Canoe township and came over to write the old man's will.' He says, 'He is all right, you go up and write it.' He says, 'I tried it yesterday, but didn't get it done; I got a couple of notes.' He says, 'He is all right.' . . . I got my paper ready and I said: 'Now I will commence,' and we commenced and it is down verbatim, word for word as he said it. Q. In the provision of the will he provides for certain persons; state whether or not he named the persons to you? A. Yes, sir. . . . Q. State whether or not there was anything said by the old gentleman about the little boy's name? A. Yes, sir. I wrote it down wrong and when I read it over, it was wrong. I didn't understand him when he gave it to me. This boy's name is Don Atley Palmer. Q. What did he say about correcting it? A. I made a mistake. When I read it over to him I read the name as I had written it and he said 'That isn't right.' I said 'What is it?' He told me and I said 'I will rectify it.' I did, and then read it over. When I read it over it was all right. Q. When you read it over did he assent to it as being correct? A. Yes, sir. . . . Q. Did you write down in the will the disposition of the $2,100 as he dictated? A. He dictated every word that is in there and I put it down. Q. Do you recollect his naming any of his children at that time? A. Yes, sir. Q. Which ones? A. Charlie Palmer. Q. What did he say about that? A. He said 'Put down $50.00 for Charlie Palmer.' He said 'Put down surface of the farm in Blacklick township to Foster Palmer during his lifetime and at his death, share and share alike to his children.' Q. Did he say anything further about Charlie Palmer? A. He said, 'He was a very ungrateful son.' . . . Q. State whether he was rational at that time? A. If my judgment is any good I would say he was all right. Q. State whether he was rational when you discussed the general subjects with him before that? A. Yes, sir. Q. After the will was written, state whether or not you read it to him? A. Certainly. Q. What did you then do? A. Put it in my pocket. . . . Q. What did you do with that will after it was signed by Mr. Palmer and witnessed? A. I says, 'What will I do with this?' I says, 'I will take it home and keep it until it is called for.' He said 'All right.' Q. What did he say about keeping the will? A. He said 'All right.' I said 'I will take it and keep

it until it is called for.' He said 'All right.' Before I went
downstairs Joseph Palmer said to me: 'You ought to have
your pay for this work.' I says, 'You can pay that some
day again.' I said, 'Never mind, I can get that some day
again'. . . . He knew what he was doing. . . . Q. He was
very clear in his mind and understood perfectly well? A. He
was clear enough; you couldn't have cheated him the day I
was there. Q. He talked pretty freely to you? A. Yes, sir;
and he talked sensibly." Bessie Palmer, the other subscrib-
ing witness to the will, testified that the testator signed his
name to it without any assistance, that he seemed to be in a
stupid condition, but that she couldn't tell whether he knew
what he was doing. The appellants proposed to ask her, on
the hearing before the court, whether she had not testified be-
fore the register that the testator's mind was clear, but this
was not permitted.

It is clear from Hurd's testimony, from which we have
quoted at length, that the testator possessed testamentary ca-
pacity, and, turning to Keeler's, what is to be found in it jus-
tifying the conclusion of the court that he did not possess it?
Called as the attending physician of the deceased, Keeler
stated in certain portions of his testimony that, as a result of
the medicine given to relieve pain, Palmer was in a torpid
condition, that his mind was stupid and inactive and he was
not in a fit condition to make a will on August 29, 1906; but,
taking the testimony of this witness as a whole, it not only
falls short of proving testamentary incapacity, but in a meas-
ure corroborates Hurd. Though in one part of it he expressed
the opinion that the decedent was not fit to make a will, in
another he says: "I don't know." Two days before it was
executed he himself had filled up two judgment notes for the
decedent and witnessed his execution of them. When asked
whether he was conscious of what he was doing in business
matters, his reply was: "At the time he made the notes, I
think he was; at the will, I don't know." In the face of this,
little importance is to be attached to his statement that he did
not consider the deceased in a "fit condition" to make a will,
and none in view of what is gathered from other portions of
his testimony. From his examination in chief before the reg-
ister we extract the following: "Q. State whether or not

you observed his conduct and expressions? A. Yes, sir. Q. State what expressions, if any, you saw out of the ordinary, or heard? A. I can't remember his expressions he made or anything he said. I know that the mind is always in a torpid condition. Q. What about his expressions to indicate he did not understand? A. He did not answer readily, and was slow about telling you how he felt." When asked, in the same examination, about the condition of the testator on the morning Hurd wrote the will, his testimony was as follows: "Q. What was the condition of Mr. Palmer that morning? A. When you spoke, he was clear about what you spoke." In his cross-examination he testified as follows: "Q. You say his answers would be clear when roused? A. To a certain extent." As to what took place between Hurd and himself, he testified as follows: "Q. You said before that Mr. Hurd came downstairs and you walked out together to your buggy? A. He followed me. Q. He there questioned you; told you he was there for the purpose of writing a will, and asked you in regard to Mr. Palmer's condition? A. He told me before he asked me what I thought of his mind. I told him he was clear by times when he roused him, but his mind was torpid when you left him alone. Q. When his mind was summed up, his answer would be clear? A. He could'nt have anything connected for any length of time. Occasionally he would be clear. He seemed to be clear while you were speaking." In his cross-examination before the court, when asked about the notes he had filled up for Palmer, he said: "He knew a certain amount of what he was doing. When you would speak to him he would speak up rational." And as to what took place between Hurd and himself, he again testified as follows: "Q. Mr. Hurd went there and had a conversation with you? A. He followed me out there. Q. Did he make inquiry out there of you about the condition of Mr. Palmer? A. He asked me what condition I found him in this morning. Q. And you told him that his mind seemed clear when you would speak to him; as clear as it would ever be? A. Yes, sir; those are about the words I said."

It is needless to dwell on the insufficiency of Keeler's testimony as a basis for the decree of the court below. Even if the conclusion was reached from it that the mind of the tes-

tator was stupid and inactive, and his thoughts seemed to come to him slowly and uncertainly, it was forgotten not only that such conditions are not inconsistent with testamentary capacity, but that from Keeler's own admissions the testator seemed to possess it. Those admissions were that he did not know whether Palmer was fit to make a will; that he seemed to be clear while one was speaking to him; that when spoken to he would speak rationally, and, on the morning the will was executed, this witness stated to Hurd that Palmer's mind seemed clear when he was spoken to. " The law presumes everyone of full age competent to make a will, of sufficient mental capacity to do the act; therefore, he who alleges to the contrary must prove it to the satisfaction of the jury : " Landis v. Landis, 1 Grant, 248. " Testamentary capacity is the normal condition of one of full age, and the affirmative is with him who undertakes to call it in question, and this affirmative he must establish, not in a doubtful, but in a positive manner : " Grubbs v. McDonald, 91 Pa. 236.

The decree is reversed and the record remitted, with direction that the register of wills of Indiana county admit to probate the paper executed by Joseph Palmer, August 29, 1906, as his last will and testament, the costs below and on this appeal to be paid by the appellees.