## Wertheimer's Estate.

*Wills—Probate—Evidence—Burden of proof—Testamentary capacity—Undue influence—Excessive use of intoxicating liquors— Husband as sole beneficiary—Meretricious relations with beneficiary before marriage—Witnesses — Competency — Medical experts.*

1. Where a writing is testamentary in character and is shown to be valid, a presumption of capacity and lack of undue influence arises; the burden is on the contestants to show the contrary.

2. Where the contestants of a woman's will charge chronic alcoholic insanity, it is the duty of the court to judge of the mental capacity of decedent as it is revealed by the evidence, and ascertain whether it was so reduced through indulgence, general or special, at the time the will was executed, as to cause the act to be ineffective.

3. Where a will was executed in 1916, a witness who could testify as to her condition up to 1913, and not thereafter, is not competent to express an opinion as to her condition when the will was made, nor are the facts to which he testified competent as bearing on the condition of the woman in 1916; and this is especially so if other proof shows that decedent was subject only to periodical intoxication from which she promptly recovered.

4. Where witnesses to a will testify before the register that testator was of sound, disposing mind at the time the will was executed, their subsequent contradictory statements, in a contest over the will, should be received with great caution, or entirely eliminated.

5. The circumstances that testatrix's signature to her will was in her normal bold and firm handwriting, while her signature executed during states of intoxication was splattered and sprawl-

ing over the paper, has a bearing upon her condition when the will was signed.

6. The opinions of medical experts in a will contest is of no aid to contestants, if such opinions are opposed to established facts.

7. Where testatrix made her will in 1916, and retained it in her safe deposit box until her death in 1923, and told four reputable witnesses that she had made a will leaving everything to her husband, such circumstances are important as bearing on her capacity when she made her will.

8. Where a testatrix married her second husband in 1912, made her will in his favor in 1916, and died in 1923, undue influence cannot be predicated on a charge of their illicit relations prior to marriage.

9. The fact that a man made week-end visits to a woman in her country house, is not in itself sufficient evidence to establish the fact of an illicit relation between them.

Argued January 25, 1926. Appeal, No. 90, Jan. T., 1926, by John M. Lee et al., collateral heirs, from decree of O. C. Pike Co., refusing issue devisavit vel non, in estate of Mary Lee Wertheimer, deceased. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Appeal from register of wills. Before RENO, P. J., specially presiding.

Issue devisavit vel non refused. John M. Lee et al., collateral heirs, appealed.

*Error assigned* was decree, quoting it.

*George Wentworth Carr*, with him *Xenophon P. Huddy*, for appellant.—The existence of meretricious relations may be proved by circumstantial evidence: Matchin v. Matchin, 6 Pa. 332; King v. King, 75 Pa. Superior Ct. 19; Dean v. Negley, 41 Pa. 312; Snyder v. Erwin, 229 Pa. 644; Reeme v. Pathemere, 8 Pa. 460; Herster v. Herster, 116 Pa. 612; Robinson v. Robinson, 203 Pa. 400; Adam's Est., 220 Pa. 531; Phillips's Est., 244 Pa. 35; Goss's Est., 274 Pa. 278; Dushane's App., 4 W. N. C. 78.

The contestants having established the insanity of Mary Lee Wertheimer prior to August 3, 1916, the burden of showing a lucid interval at the very time of the execution of the will rested upon the proponent: Rogers v. Walker, 6 Pa. 371; Harden v. Hays, 9 Pa. 151; Taylor v. Trich, 165 Pa. 586.

The case at bar stands alone in its uncontradicted evidence as to the intoxication of a testator at the time of the execution of the will: Schusler's Est., 198 Pa. 81; Tasker's Est., 205 Pa. 455; Macauley's Est., 224 Pa. 1; Ewart's Est., 246 Pa. 579; Nolan's Est., 261 Pa. 188; Wilson v. Bigger, 7 W. & S. 111.

*Wilton A. Erdman,* with him *George R. Bull,* for appellee, cited, on the question of undue influence: Buechley's Est., 278 Pa. 227; Tetlow's Est., 269 Pa. 486; Gongaware v. Donehoo, 255 Pa. 502; Reichenbach v. Ruddach, 127 Pa. 564; Dean v. Negley, 41 Pa. 312; Snyder v. Erwin, 229 Pa. 644; Allshouse v. Kelly, 219 Pa. 652; Watmough's Est., 258 Pa. 22; Geddes' Est., 283 Pa. 139; South Side Trust Co. v. McGrew, 219 Pa. 606.

On the question of insanity: Werstler v. Custer, 46 Pa. 502; Snyder's Est., 279 Pa. 63.

OPINION BY MR. JUSTICE KEPHART, April 12, 1926:

Mary Livingston Lee was born in Mississippi in 1865. She married Archer Harmon and went to live with him in New York where he conducted a railroad contracting business. He had large interests in distant countries which took him away from his home for long periods of time. It was during one of his trips abroad in 1902 that Mrs. Harmon met a young lawyer, Leo Wertheimer, whether professionally or socially is not stated. He visited Mrs. Harmon in her New York home quite frequently and continued to do so until Mr. and Mrs. Harmon went to Europe. While there, because of the wife's conduct it was said, the husband separated from her in 1904 or 1905, but thereafter

made ample provision for her support. Mrs. Harmon returned to her New York residence. Later she moved to Milford, Pa., ultimately taking up a residence at her country house, Golden Spring, a few miles out of that town. Upon her return to this country, Wertheimer renewed his visits to her, principally over week-ends, a room at Golden Spring being reserved for him.

Harmon, in 1911, was thrown from a horse and killed; by his will his wife was excluded from enjoying any part of his estate; the bulk was left to their daughter, Kate, the only living child.

Sometime after Harmon's death, or in December, 1912, Wertheimer married Mrs. Harmon; later, in 1916, she became possessed of a large part of the estate of her former husband, by the death of the daughter, Kate. Testatrix and Wertheimer, her husband, lived together until the wife's death March 15, 1923. Her will, dated August 3, 1916, wherein she gave all her property to Leo, her husband, being admitted to probate by the register, was attacked through an appeal from that decision. The contestants were her distant relatives not Harmon's, being a half brother, half nieces, and half nephews. The court below refused an issue d. v. n. and from that decree the present appeal was taken. The charge against the validity of the will was lack of testamentary capacity and undue influence.

As the controversy embraced her mentality, it may be well at first to state some things about her which bear upon that subject, to better gauge contestant's task to annul the will. The court below finds she was a woman of rare beauty, as appears by a photograph taken in 1916 when the will was written. We do not have that picture before us. But we do have one, appearing from the evidence in the record. She was an educated woman, possessing in a marked degree superior qualities in many lines of intellectual endeavor. She was not only an omnivorous reader of the best classics in prose and poetry but also endeavored in like manner to translate

her own thoughts. Her poetry may not appeal as a striking illustration of poetic vision; it was not constructed in orthodox style, taste or diction; but it cannot be said to be the work of an ordinary mind. She had talent in painting, some of her china bringing very high prices. She was a musician of marked ability, being a composer as well as performer. During the year in which her will was written, she composed the words and music of an opera that was produced in the fall of that year. After the settlement of her daughter's estate, there was considerable property to look after, some $200,000. She personally made loans, bought and sold lands, executing deeds for the latter, bought and sold bonds, drew hundreds of checks, planned and supervised the erection of a country mansion, conducted a large establishment, hiring and discharging servants, and managing numerous other details. She was the woman chairman of the Democratic party, the dominant party, in Pike County, organizing and addressing many of its political meetings. She originated the community Christmas tree with its accompanying distribution of gifts to children. It has since been continued by the citizens as a memorial to her. She successfully planned and conducted charity balls and social functions, and to the day of her death was the guest of the best people of Milford. Her outstanding characteristics, apart from the incidents we shall later mention, were those of a very charming woman, fastidious in dress and of an engaging personality. One of the counsel for contestants concedes this, for during this period of 15 years, he not only accepted her hospitality but invited her as a guest to his own home. She was careful in her purchases, showing taste in her personal selections, and exercising good business judgment in all her dealings.

The above correctly portrays what may be termed the essentials in this woman's life, when considering mentality, from the time she first met Harmon until the end of her life. They were in accord with social standards

and might be as near perfect as one could expect in this life, if it had not been for one serious misfortune on which appellants have built their case. We may say that this failing was through no fault of hers but was contracted as a result of professional advice in taking gin medicinally at stated periods.

The charge of incapacity rests on chronic alcoholic insanity from 1908 to the day of her death. The writing here in question being testamentary, and having been shown to be valid, a presumption of capacity and lack of undue influence arises. The burden is on contestants to show the contrary: Lawrence's Est., 286 Pa. 58; Egbert v. Egbert, 78 Pa. 326; Grubbs v. McDonald, 91 Pa. 236; Palmer's Est., 219 Pa. 303.

Proponents' counsel do not for a moment contend that a mind, so weakened by the use of liquor that it does not comprehend acts committed, would be competent or capable of making a will while in that condition. They admit decedent drank freely and frequently to excess, that when in such state she was incapacitated, and acted contrary to social standards, without knowing afterwards what had taken place. But they insist, and the court below found, that these indulgences, at times frequent, were periodic invasions of her normal condition, in no sense permanent, and this condition of mind disappeared shortly after these excursions when she again became absolutely normal, or in the condition first above described. We do not sit as a court to criticise social standards or rectitude of conduct. We do not assume to pass judgment on acts such as just related of testatrix; our function is solely to determine whether these acts so far affected her mental processes as to render her incapable of exercising the intelligence necessary to make a will. It may be her specialized training to some extent accounts for her eccentricities in drinking. One of America's greatest lawyers and another, a great poet and prose writer, were hard drinkers, taking periodic sprees and that influence did not prevent some of their

best work being produced. We would scarcely say they were generally or alcoholically insane simply because they went on periodic sprees of more or less lengthy duration.

While all this is true, we cannot overlook our duty to safeguard the integrity of wills, a policy for which this court is noted. We must judge of the mental capacity as it is revealed by the evidence and ascertain whether it was so reduced through indulgences, general or special, at the time the will was executed, as to cause the act to be ineffective.

In 1916, did the woman have mental capacity to make her will? Much evidence has been introduced as to her mental state at a later period. Though competent, as throwing some light on her acts in 1916, it is practically useless to prove her insane at that time if she is found to have been sane or not intoxicated when the will was executed. No person saw her sign the writing. It was prepared in New York and the copy there executed was lost. A duplicate, the one in question, was executed at her home. The time is not fixed. Presumably it was the date stated therein. She called two of her servants to witness her signature. They made affidavit before the register that she was of sound disposing mind at that time. They appeared in the court below to contradict that affidavit, at least in part. Such contradiction, weak as it is, should be received with great caution. If circumstances appear which support the validity of the writing, it should be adopted and such contrary testimony of the subscribing witnesses entirely eliminated from consideration: Werstler v. Custer, 46 Pa. 502. These circumstances appear in abundance, not only from the character of her own handwriting to the document, but also other facts attending the signing by these two witnesses. They did not see her write her name, but she walked some distance to summon them and directed the manner of execution. She knew what must be done to make a valid will and exercised the knowledge necessary. The whole

story impresses one with the fact that the woman clearly understood what she was then doing. Had she been insane or intoxicated, to a degree depriving her of an intelligent exercise of her faculties, the will would not then have been witnessed.

The primary assault on capacity is made by William Lee, a half nephew, Doctor Barckley and Mr. Watson. We might give Mr. Lee's testimony more consideration were it not for an event, in which he was a very active party, that utterly destroys his credibility. His account is a resumé of testatrix's drinking life from 1898, with its accompanying incidents, up to the time he ceased to visit her house in 1913. It expresses a strong conviction of her unfitness to make a will at any time. His testimony, however, does not cover the period immediately before, at or after its execution. Without impeachment, it throws no light on the future. For that reason we may overlook his interest in the outcome of the case as well as his feeling toward testatrix over a difficulty which ended his visits to her. When we consider the acts of this man, who, in December, 1912, sent out the invitations to the marriage of the person he now stigmatizes as being then an alcoholic insane of low traits, and yet personally gave the bride away and then appeared in court to denounce her as an imbecile, we are not surprised the court below refused to believe his testimony, passing it as unworthy of credit. His evidence was correctly weighed and summarized by the court below.

Doctor Barckley in his assault on this woman's mental status must also suffer challenge. He received checks from her in payment of services when she was in a high state of intoxication, the signatures sprawling over the paper, totally unlike that attached to the will, and other checks and documents when sober. In 1916, when he described her as mentally unfit to make a will, he witnessed her signature to an assignment of all her interest in the Harmon estate, as security for a debt of $9,000. This was an act that might have been exceed-

ingly prolific of disastrous results had the paper been in the hands of a dishonest person or had the assignee's death intervened. The value of this estate afterwards turned out to be $200,000. If she was then insane, the act of the family doctor in permitting this assignment was rightfully criticised by the court below: Werstler v. Custer, supra; Snyder's Est., 279 Pa. 63, 74, 75. She was not insane then nor when the will was written.

Doctor Barckley's testimony is tinged with the weakness which usually comes from a man who has been or thinks he has been outraged. He states this woman charged him with attempting to violate her person and that she attempted to shoot him. He admitted resentment and ill-feeling toward her. The husband denies the entire charge and states that the doctor's professional relations with testatrix were broken off because he took $2,800 from Mrs. Wertheimer through unjust and unfair charges, attending her at times when it was unnecessary to do so, in other words, that he "farmed his case." Much of the money was taken when she was drunk and the record exhibits a sad state of professional conduct. The court below, with justice, condemned such acts. The doctor says in one breath that she was insane from chronic alcoholism during all the time he attended her and in another that when "she was at herself she was one of the most charming women you ever met," winding up with "she was utterly incompetent to make a will."

We will dismiss Watson's testimony in the same manner as did the court below. The other evidence, minor in character, deserves little consideration. The opinion of medical experts, being opposed to established facts, is of no aid to contestants: Snyder's Est., 279 Pa. 63. It is therefore unnecessary to discuss the effect of an unrestrained use of intoxicating liquor, and the symptoms accompanying chronic, acute or periodic drinking. Nor will we comment extensively on proponent's evidence. The court below has fully covered all aspects of the case.

Some facts, however, may be mentioned which show capacity in 1916. The will was drafted by a New York lawyer solely at the solicitation of Mrs. Wertheimer. She told at least four very reputable witnesses during the intervening time that she had made a will giving everything to Leo. She retained it in her own safety deposit box in the bank to which she alone had access. This was an important circumstance in Irish v. Smith, 8 S. & R. 573; White's Est., 262 Pa. 356, 360; South Side Trust Co. v. McGrew, 219 Pa. 606, 610. Very frequently all the papers were taken out of the box and examined, according to a bank officer, and she knew perfectly well that the last will and testament was there. As mentioned above, it was in 1916 that she composed an opera, and afterwards instituted some litigation over it. During this year she consulted with and advised her counsel relative to the institution of proceedings whereby she received upwards of $200,000 from her daughter's estate. She made an assignment of all her interest in the Harmon estate for a loan of $9,000. This was the assignment witnessed by Doctor Barckley. Before, after and during 1916, she sold real estate, joining with her husband in deeds, sold securities as we have stated, borrowed money from the bank and gave her notes therefor. One of the most convincing acts was the character of her signature. It is in a bold, firm hand without a tremor,— not in the splattered, sprawling form she used when intoxicated. The bank officer, possibly the one person more familiar with her business than anyone else, gave abundant evidence of her capacity at all times. Proponent produced medical testimony but the facts here are sufficient. The record is large; to attempt any detailed analysis would serve no useful purpose and would be of interest only to the parties involved.

The second ground of complaint is undue influence predicated on a charge of illicit relation between testatrix and her husband prior to their marriage in 1912. It may be doubted whether the rule in Dean v. Negley,

41 Pa. 312; Reichenbach v. Ruddach, 127 Pa. 564, and Snyder v. Erwin, 229 Pa. 644, "that, where meretricious relation has been shown to have existed between the testator and the principal beneficiary under his will and the will diverts the entire estate from the natural objects of the testator's bounty and gives it over to a woman he has just married and with whom adulterous commerce has been carried on, the presumption arises that the will was procured by undue influence," is still the law: Ewart's Est., 246 Pa. 579, 585, 586; Kustus v. Hager, 269 Pa. 103, 110, 111, where it appears the rule has been considerably modified if not entirely departed from. Such a presumption cannot arise or continue where the marriage relation has existed for a long time, here more than ten years. There may be circumstances where such presumption would be efficacious but these do not exist in the present case. There is not sufficient evidence to find the fact of illicit relationship. The conduct of the parties may warrant a suspicion but we must have more than a suspicion to annul a will. The fact that week-end visits were made to testatrix's residence in New York and Milford gives color to the charge of indiscretion according to ordinary social standards but does not warrant a finding of illicit relation, or a control amounting to moral coercion, such as would impair the will now under consideration, made several years after their marriage: Geddes's Est., 283 Pa. 139.

On the basis of contestant's evidence, the proof tending to negative control by anybody besides her own will is abundant. She frequently referred to her husband in terms of endearment. There is no evidence, outside of this accusation, that he ever endeavored to influence her in any other than a proper channel. We agree with the conclusion of the court below that the charge of undue influence was not established.

The case is clear, from our rulings in previous cases, that the decree of the court below supporting the will was properly entered.

Decree affirmed at cost of appellant.