## Kelly's Estate.

*Joseph S. Hollister*, for appellants.

*Joseph H. Deppen* and *H. W. Cummings*, for respondents.

LLOYD, J., June 30, 1930.—James E. Kelly died December 5, 1929, at an age which does not definitely appear, but which is inferable from the testimony to be some sixty odd years, leaving a will executed December 2, 1929. He was survived by a brother, Stephen Kelly, and a sister, Mrs. Bridget Connaghan, to each of whom he had bequeathed the sum of $1. The entire balance of the estate, the value of which is not shown, he bequeathed to Annie Burns, his first cousin, whom he also nominated as executrix. The will was duly probated on December 6, 1929, and letters testamentary issued to the said Annie Burns. On December 23rd following, Bridget Connaghan and Stephen Kelly appealed from the action of the register of wills in admitting to probate the said will, and on December 30th secured a citation directed to the said Annie Burns to show cause why their said appeal should not be sustained and an issue directed to the court of common pleas to try by jury (a) whether or not at the time of the execution of said writing the said decedent was a person of sound mind; (b) whether or not the said writing was procured by undue influence, duress and constraint practiced upon the said decedent by Annie Burns and others; and (c) whether or not the said writing is the will of the said decedent.

The execution of the will was duly proven by the subscribing witnesses. The proponent had thus presented a *prima facie* case, and a legal presumption of competency arose, the burden of disproving which in a positive manner rested upon the contestants. For "the law presumes every one of full age competent to make a will, of sufficient mental capacity to do the act; therefore, he who alleges to the contrary must prove it to the satisfaction of the jury:" Landis *v.* Landis, 1 Grant, 248. "Testamentary capacity is the normal condition of one of full age, and the affirmative is with him who undertakes to call it in question, and this affirmative he must establish, not in a doubtful, but in a positive manner:" Grubbs *v.* McDonald, 91 Pa. 236. See, also, Wertheimer's Estate, 286 Pa. 155.

At the time when the will was made and for several months previous thereto the testator lived in the home of John and Annie Burns. "He was suffering from an infection of the bones—a pus infection of the bones of the right foot and also a toxic condition of the body." Physically the disease was progressively destructive; but there is no evidence that testator's disease in any way affected his mentality. In fact, until the date of the execution of this will his competency was not questioned. But the contestants contend that on that day, by reason of his said condition and the accompanying pain, the testator's mind was so much impaired that he was not then competent to make the will. Mrs. Annie Sullivan testified that she visited the sick room for about three-quarters of an hour; that she had not known the testator previously thereto; that "he did not seem to know anybody was in the room;" that he did not speak to Annie and "just moaned as though he was in pain." The testimony of Dorothy Connaghan, the daughter of the contestant, covers the same period of time as that of Mrs. Sullivan and does not differ materially therefrom. Mr. Edward Campbell, one of the subscribing witnesses, testified that he had never seen the testator before the time when he witnessed the will; that testator did not speak at the time and that his face was turned away from the scrivener when he raised his hand to make the mark. The following excerpt from his testimony explains the reason for his presence at the signing of the will, the condition of the testator and the manner in which the will was executed:

"Mr. Burns came up and asked me to witness a will; he said he wanted me to go down to the house there; he says he is pretty sick; he says he might live a day and he might live a week; I went down; Mr. Deppen came in with the will when I did; Mr. Kelly, I thought, was in a pretty weakened condition, so Mr. Deppen told him to put his hand to the pen; he was lying on the side like that (indicating), and he laid over this way on his side and spoke or noticed nobody. . . .

"No, sir; he raised it up like that (indicating) and touched it to Mr. Deppen and he gave him the pen and then laid it down; he laid on his side; I didn't say anything and he didn't say anything more that I heard; I ain't positive; I thought he made a will a couple of months before; I stayed there about fifteen or twenty minutes."

He also testified that, "Under oath, I would say he was very, very weak; a weakened condition." In response to a question relating to the mental condition of the testator, he answered, "I don't know whether he did or not; I don't know what is his mental condition." Doubtless the contestants rely most strongly upon the testimony of Doctor Jacoby, who visited the testator for about ten or fifteen minutes at or about 10 o'clock in the morning of the day in question. He testified that testator was then in a "depressed mental condition;" his "mind clouded;" his condition "very bad;" he was in a "some-

what stuporous condition;" "there was a time that his mind was not as clear, not as wide awake concerning this as before." He then expressed the opinion that the testator was not "in a fit condition to know what he was doing." The doctor's subsequent testimony not only greatly injures but utterly destroys his opinion as to the mental capacity of the testator to transact business. Responding to questions propounded under cross-examination, he answered that his conversation with the testator was limited to matters relating to the disease and that on the day in question he aroused the testator, who recognized him and answered all of his inquiries understandingly.

The foregoing presentation of contestants' testimony relating to the testamentary capacity of the testator, although condensed, embraces all the material facts and is as full and complete as the evidence warrants. It discloses no mental decay, brain deterioration, delusions, hallucinations, mental disease or incapacity to transact business prior to or on December 2, 1929. The whole of it may be taken as true, and yet it exhibits nothing inconsistent with testamentary capacity, which embraces more than physical weakness, depressed mental condition, a temporary stupor, a refusal or failure to react to external surroundings or an indifference to social amenities. Neither age, nor sickness, nor extreme distress, nor debility of body, nor other physical infirmity will affect the capacity to make a will, unless the affliction has so impaired the mentality of the testator as to render him incapable of knowing the nature and effect of the act he was engaged in; a full knowledge of the property to be passed; an understanding of the disposition he wished to make of it by will and the persons he desired to participate in his bounty. Testamentary capacity is to be determined by soundness of mind and not of body. Under the evidence in the present case, the relevant rules by which it is to be tested are thus stated:

"In considering whether or not testator knew and understood what he was doing when he made his will, we must start, therefore, not only with the fact that he had mental capacity, but also that whatever weakness of mind existed was not shown to have resulted in any foolish or unbusinesslike act; and this is an important consideration, for 'as a general proposition less capacity is sufficient to make a valid will than to transact ordinary business:' Thompson v. Kyner, 65 Pa. 368; Guarantee Trust and Safe Deposit Co. v. Waller, 240 Pa. 575;" Kustus v. Hager, 269 Pa. 103, 107.

"A testator's 'memory may be very imperfect; it may be greatly impaired by age or disease. He may not be able at all times to recollect the names, the persons or the families of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered; and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. . . . The question is not so much what was the degree of memory possessed by the testator, as this—Had he a disposing memory? Was he capable of recollecting the property he was about to bequeath; the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligent form—Were his mind and memory sufficiently sound to enable him to know, and to understand, the business in which he was engaged at the time he executed the will:' Wilson v. Mitchell, 101 Pa. 495, 502-3:" Snyder's Estate, 279 Pa. 63, 73.

Viewed in the light of these decisions, the contestants' evidence is wholly insufficient to establish testamentary incapacity, either before or at the time of the execution of the will. This conclusion brings us to a consideration of the charge of undue influence. There is no direct evidence to establish it. The contestants still have the laboring oar. The proof must be direct, clear

and convincing: Logan's Estate, 195 Pa. 282. It must show fraud, threats or misrepresentations, undue flattery, or physical or moral coercion, so as to destroy the testator's free agency operating as a present constraint at the making of the will—such as to subjugate the mind of the testator to the will of the person operating upon it: Tawney *v.* Long, 76 Pa. 106. "It is only when fraud, deceit or such domination as subjects the mind of the decedent, is shown, that undue influence can be said to appear:" Leisey's Estate, 280 Pa. 533. "To sustain the charge of undue influence, contestants had to show that testator's mind was under its control 'at the time and in the very act of making his will:'" Tetlow's Estate, 269 Pa. 486, 496. "When a will is attacked on the ground of undue influence, 'it is necessary to bear in mind the meaning of the term; . . . as a legal phrase it is used as denoting . . . something violative of legal duty. . . . The word "influence" does not refer to any and every line of conduct capable of disposing in one's favor a fully and self-directing mind, but to a control acquired over another which virtually destroys his free agency. . . . In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind, . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of the will:'" Phillips's Estate, 244 Pa. 35, 43.

The testimony on behalf of the contestants does not even approximate these requirements. William J. Neiswender, who was a patient at the Fountain Springs Hospital in the month of August, testified that he then had a conversation with the testator, who said: "Bill, I want you to do me a favor, he says, and I said all right, I will if I can; what is it? Well, he says, it's this: These people are enticing me to leave here and the agreement is the same with them as I had with the hospital, you know, for taking care of me, he says; when I do leave here I feel it is my estate more than myself they are after; I may be influenced to change the will, but he says I will never do so if I am in sound mind; I will never execute another will, he said; I want the will that I made; I want that to stand; I want that to be final to provide for my sister and my brother; he says, if I ever make another will I will not be in my right mind and under heavy influence." Thomas Coriga, also a patient at the said hospital in July and the early part of August, testified that during a conversation with the testator in reference to the testator's brother Stephen, the testator said: "I won't forget him when I go, he says; I am not going to be enticed to leave a will so he will have to go out on the ways of the world with his one arm." And, further, while speaking of the proponent's family, said "they want to take him home."

These declarations, if accepted, are mere *ex parte* expressions of the testator and insufficient to affect the validity of the will. Attributing to them the utmost construction favorable to the contestants, they amount to nothing more than a mere purpose on the part of the proponent to ingratiate herself into the affections of the testator—an indirect method of solicitation ineffective to invalidate a devise: Miller *v.* Miller, 3 S. & R. 267. But beyond this these declarations are too remote from the time of the execution of the will and are not so connected with other facts and circumstances indicating circumvention or fraud in the procurement of the will as to make them part of the *res gestæ*, and are, therefore, not evidence: Tawney *v.* Long, 76 Pa. 106, 116.

Substituting the name of the proponent in the present case for the name of the proponent in Johnson's Estate, 159 Pa. 630, 633, the language of the court

as there used is directly applicable to the present situation. As thus modified, it would then read: That in point of fact the case is absolutely destitute of proof of a single act of influence, undue or otherwise, on the part of Mrs. Burns. There is no testimony to show that she ever, at any time or in any circumstances, even so much as asked him to make a provision in her favor. The will was written by the scrivener at the instance and request of the testator without the slightest proof that Mrs. Burns had anything to do with it or that she knew what was intended to be done.

We are not called upon to search for, and neither does the law require that the testator assign any reasons for his bequests; yet, if such were needed to supply any deficiencies in the present case, they are to be abundantly found in the will itself. The testimony upon this branch of contestants' case is so lamentably weak as to preclude the necessity for any reference to proponent's testimony.

We conclude that contestants' evidence, even when looked at separately, would not support a verdict against the will which this court could in conscience permit to stand. It is, therefore, our duty to refuse the issue: Tetlow's Estate, *supra*.

And now, June 30, 1930, the contestants' appeal is hereby discharged and an issue *devisavit vel non* is refused.

An exception is noted and bill sealed for the contestants.

From C. M. Clement, Sunbury, Pa.