# Wallize *versus* Wallize *et al.*

1. The execution of a will having been proved, evidence was given that names directed by the testator to be inserted had been omitted, the court charged: "In view, then, of all the facts, does the paper produced as the will of old Mr. Wallize, contain the disposition he made of his property. Are the῾ ᾿nes of any of his children, whom he intended should have part of his property, omitted, and was the omission the inadvertence, oversight or intention of Esq. Barr. If this is not his will, the disposition he made of his property as communicated to Esq. Barr, then it ought to be set aside." *Held*, to be error.

2. Parol evidence as to mistakes in a will discussed in this case.

February 1st 1867.   Before WOODWARD, C. J., THOMPSON, READ and AGNEW, JJ.   STRONG, J., at Nisi Prius.

[Wallize *v.* Wallize.]

Error to the Court of Common Pleas of *Northumberland county*. Feigned issue to try the validity of a paper writing, purporting to be the will of John Wallize, deceased. The will had been admitted to probate, December 14th 1863, by the register; on appeal by John Wallize, a son of the testator, the Register's Court ordered an issue, and directed the appellant should be the plaintiff, and Sarah Wallize, his widow, and others, devisees in the will, should be defendants.

As the case therefore was tried in the Court of Common Pleas, the plaintiff assailed the will and the defendants sustained it.

The will, which was given in evidence, was dated October 28th 1861. By it the testator gave to his wife the interest of $1400, and some household furniture for life; he gave one equal share of his estate to Samuel Gray and others, children of his daughter Abby Gray, deceased; he gave the rest of his estate to Samuel H. Wallize and other children. Two of his children, John Wallize and Catharine Speck, were not provided for by the will.

The Gray children were not parties to the issue.

On the trial, George Kisner, a subscribing witness, testified for the plaintiff that he went to the scrivener (James D. Barr) with the testator, with a former will in his pocket which he gave to Barr, who "asked Wallize how he wanted the will made? Wallize said just like the first, except put Sam out. Esq. Barr went at it and wrote it. The old will was made in Wallize's house some years. I was a witness to old will. The old man took old will away. He didn't say he had destroyed it. John Wallize and Katy Speck are children of John Wallize. Esq. Barr didn't read will over after it was finished; I heard first will read. Old Wallize went out and got Michael Reader for a witness, Reader came in; Wallize said to Reader, read it over; Barr said he had read it enough. The parts of second will in which names of children were mentioned were not read over. Wallize said, make it like first will, but said nothing about his children. When Barr came to Katy Speck's share, Esq. Barr said, How about the $100? He said, 'Never mind, make it even.' Katy Speck had two girls and a boy."

James D. Barr, for the defendants, testified: "Wallize asked me to write another will. I went to my office and wrote it. After I wrote it Wallize went out and called Mr. Reader in as a witness. It was signed there by Wallize and the witnesses. He directed me in writing it. I wrote it as he directed; I read it as I went along (part of it) sentences as I wrote. After I was done writing I read it all to Mr. Wallize. He asked me if the will would be good if he wouldn't give John and Katy anything. Told him thought it would. Then we closed will just as we have it. I think the will is precisely as he dictated it to me. I read it to him just as I had written it. Mr. Reader asked me to read the will. Told him

[Wallize *v.* Wallize.]

I had read it often enough, I thought. I said this in hearing of John Wallize. He sat at the table. I had read it over to Mr. Wallize at least twice, is the reason why I refused to read it again. He wanted to make some change in the will, put in other executors, and leave his daughter Catharine out. Wanted to know if will would be good if he left her out. New will was not copied from old one at all. The old man at time I wrote will told me John had treated him badly. He said 'I won't give him a d——d cent.' The old man often complained of John's bad treatment to him. It must have been during ten years before."

The defendants gave evidence also of ill-treatment of the testator by John Wallize, and the children of his daughter Mrs Speck. They proved also the execution of the will by the other subscribing witness.

The plaintiffs in rebuttal gave evidence of declarations by the scrivener, that the testator requested him to leave the former will as it was, for in it all the children were left equal:—that Mrs. Speck was equal with the rest,—that all the heirs were in the will.

The court (Jordan, P. J.) charged the jury:—

" In view, then, of all the facts, does the paper produced as the will of old Mr. Wallize, contain the disposition he made of his property ? Are the names of any of his children, who he intended should have part of his property, omitted, and was the omission the inadvertence, oversight or intention of Esq. Barr ? If this is not his will, the disposition he made of his property as communicated to Esq. Barr, then it ought to be set aside. If, however, it is the disposition he made of his property, it ought not to be set aside, although some of his children do not share in the disposition made of his property."

There was a verdict for the plaintiffs and against the validity of the will.

The defendants took a writ of error, and assigned for error the above portion of the charge.

(Before the opening of the argument C. J. Woodward remarked, " The support of the will should have been the plaintiff's in the issue.")

*J. B. Packer* and *J. W. Comly,* for plaintiffs in error, cited Towers *v.* Moore, 2 Vern. 98 ; 1 Greenl. Ev. § 290 ; Powell on Dev. 465 ; Vernon *v.* Kirk, 6 Casey 218 ; Lewis *v.* Lewis, 6 S. & R. 496 ; Miller *v.* Travers, 8 Bing. 244 (21 E. C. L. R. 524) ; Comstock *v.* Hadlyne Ecc. Society, 8 Conn. 254 ; Provis *v.* Reed, 5 Bing. 435 (15 E. C. L. R. 658) ; Philipps *v.* Chamberlaine, 4 Ves. 51.

*W. S. Lawson,* for defendant in error, cited Lewis *v* Lewis, 6 S. & R. 497 ; 1 Greenl. Ev. § 287 ; Hess Appeal, 7 Wright

76; Harrison v. Rowan, 3 W. C. C. Rep. 385; Powell on Dev. 691, 675.

The opinion of the court was delivered, May 20th 1867, by

READ, J.—This was an issue *devisavit vel non*, directed by the Register's Court, upon an appeal from the register of wills of the county of Northumberland, admitting to probate a paper purporting to be the last will and testament of John Wallize, late of Lewis township, deceased, in which, by direction of the court, John Wallize, the appellant, was plaintiff, and the devisees of the testator defendants. There are omitted from the devisees named as defendants the six grandchildren of the decedent, the heirs of his daughter Abby Gray, deceased, and named in the third clause of the will.

John Wallize, a vigorous old man of eighty years of age, on the 28th October 1861, walked from his house to that of James D. Barr, Esq., and back, a distance of over eight miles. At this visit Mr. Barr, at his request, drew a will for him, which he executed in Barr's presence, and in that of two witnesses, Michael Reader and George Kisner, who proved the same before the register in the usual form on the 14th December 1863. There were therefore three witnesses to its execution, the writer of it, and the two called upon to witness it. In support of the will, therefore, was the original probate, and opposed to it was the evidence of George Kisner, one of the subscribing witnesses. He testified that he went with the decedent to Barr, who told Barr he wanted to make another will. "I had," said he, "the will in my pocket and gave it to Barr. He asked Wallize how he wanted the will made? Wallize said just like the first, except put Sam out. Esq. Barr went at it and wrote it. The old will was made in Wallize's house some years. I was a witness to the old will. The old man took old will away. He did not say he had destroyed it. John Wallize and Katy Speck are children of John Wallize. Esq. Barr did not read will over after it was finished; I heard first will read. Old Wallize went out and got Michael Reader for a witness. Reader came in; Wallize said to Barr, Read it over. Barr said he had read it enough. The parts of second will in which names of children were mentioned were not read over. Wallize said, Make it like first will, but said nothing about his children. When Barr came to Katy Speck's share, Esq. Barr said how about the $100? He said, 'Never mind, make it even.' Katy Speck had two girls and a boy." On cross-examination he said: "I took the new will home from Esq. Barr. I was in the house all the time Esq. Barr was writing the will." "The will was finished before Wallize went for Reader." "I said before that Wallize told Barr in English what to write. Barr read some part of it to Wallize as he wrote it. Reader was there when Barr said he would not read it; that he had read it enough."

[Wallize *v.* Wallize.]

There is no evidence that John Wallize's name was in the first will.

On the part of the defence James D. Barr was examined and testified: "I wrote it (the will) my handwrite. Kisner and Wallize came to my house together. Wallize asked me to write another will. I went to my office and wrote it. After I wrote it Wallize went out and called Mr. Reader in as a witness. It was signed then by Wallize and the witnesses. He directed me in writing it. I wrote it as he directed; I read as I went along (part of it) sentences as I wrote. After it was done writing I read it all to Mr. Wallize. He asked if the will would be good if he would not give John and Katy anything? Told him I thought it would. Then we closed; will just as we have it. I think the will is precisely as he dictated it to me. I read it to him just as I had written it. Mr. Reader asked me to read the will. Told him I had read it often enough, I thought. I said this in hearing of John Wallize. He sat at the table. I had read it over to Mr. Wallize at least twice, is the reason why I refused to read it again. He wanted to make some change in his will, put in other executors, and leave his daughter Catharine out. Wanted to know if will would be good if he left her out. *New will was not copied from the old one at all.* Don't recollect of knowing anything of old will that day; doing anything with it. I had written him a will before. Kisner sat back at corner, while I was writing will, on opposite side of room. Wallize sat close to me at the table. Kisner went out of the office at least once while I was writing to get a drink. The old man at time I wrote will told me John had treated him badly. He said 'I won't give him a d——d cent.' The old man often complained of John's bad treatment to him. It must have been during ten years before."

Michael Reader, the other subscribing witness, corroborates Barr: "Am witness to the will; he came to me to sign it as a witness. To go over to Esq. Barr's; when I came there paper was lying there, and he said I should sign it as a witness to the will. I signed it, but did not hear it read. The old man acknowledged it to be his will. It seems to me Esq. Barr told him it was not necessary to read it; that he had read it to him (the old man) before. The old man at this time stood alongside of me, and Barr at the table. Old man made no reply."

There was also evidence showing John was on bad terms with his father for some years, and that old Wallize said John had all the property he was going to give him, and that he had said he never would give John anything, and said John had abused him; and a daughter of Samuel heard her grandfather say his son John should not have anything; heard him say so three or four days before he died; heard him say so frequently during the nine years he lived with her father.

[Wallize v. Wallize.]

He also complained of his grandson John Speck; he had abused him very much about a cultivator, and had had a lawsuit about it which cost him $100, and said I will cut him short for it some day.

The rebutting testimony was a feeble attempt to discredit Barr.

The will itself shows the improbability of Kisner's statements, and the probate by himself and Reader of the will is in the face of his testimony on the trial, whilst it is clear that the disposition of the testator as evidenced by his declarations was to exclude his son John, and at least some of his daughter Catharine's family from all benefits under his will.

The narrative of Mr. Barr is clear and consistent, and if believed, as it should be, shows unquestionably that there was no omission of any devise or legacy to any one by him by his inadvertence, oversight or intention.

It will be perceived that we have a different view of this case from that of the learned judge in the court below, but we are now called upon to say whether there was any error in his charge in point of law.

"In view then, gentlemen," says the learned judge, "of all the facts, does the paper produced as the will of old Mr. Wallize, contain the disposition he made of his property?

"Are the names of any of his children who he intended should have part of his property omitted, and was the omission the inadvertence, oversight or intention of Esq. Barr? If this is not his will the disposition he made of his property as communicated to Esq. Barr, then it ought to be set aside."

In this we think there was manifest error, for if such were the law, then a man's will would not be a written instrument signed by him at the end, but the vague, disjointed recollection of a bystander after a lapse of years.

The only case cited in the argument bearing directly upon the question was the case of Comstock v. Hadlyme Ecclesiastical Society, 8 Conn. R. 254; in which it was held that a mistake in drafting a will does not render it void. The mistake there was in omitting a legacy of $100 to each of testator's grandchildren.

The court said, p. 265: "But the most important objection is the omission to insert the legacy to her grandchildren of $100 each. That the testatrix directed this, that she supposed it was done, and that it was not done,—are to be considered as proved for the purposes of this motion.

"It is said, that this omission makes the will void; that it shows it was not her will—not the will she meant to make. Now, if a mistake in drafting a will makes it void, it is certainly very surprising that no case has been produced from an *English* or *American* book in support of the proposition, although the various decisions relative to the construction of the Statute of Frauds would

[Wallize *v.* Wallize.]

fill volumes. It cannot be believed, but that similar mistakes have often been made."

"The statute, when it required all wills to be in writing signed by the testator and attested by witnesses, certainly intended, that the evidence and the whole evidence of the disposition of property by will, should be the will itself, that the evidence of the intent of the devisor should be derived from the writing signed by him, and solemnly attested; otherwise innumerable would be the cases where evidence of mistake would be claimed and proved. To use the language of Ch. J. Best, in the case before cited, some witness would constantly be brought forward to set aside the most solemn instrument: 5 Bing. 435." After further discussing the question the court say, p. 266. "In contracts mistakes have indeed been *rectified* in a Court of Chancery, but no case is recollected, where they have been holden *void*, on account of a mistake." "And it would seem that in this case if any remedy existed, it would be one that would not destroy the whole will, but one which would correct the mistake. This has been attempted in a recent case; and it was decided that parol testimony could not be admitted to prove the mistake. It would be to make a will by witnesses, and not by writing; to make a will anything: Avery *et ux.*, *v.* Chappel *et al.*, 6 Conn. Rep. 270, 275. And if such evidence cannot be admitted in chancery, to prove a mistake in a will, where is the principle or where the authority that such evidence can be admitted to render the will void? Can courts of law dispense with rules of evidence more readily than Courts of Chancery, or is the obligation imposed upon them by statute less imperative?" In the case in 6 Coun. the court affirm the doctrine, that parol evidence is inadmissible to prove a mistake in drafting a will. At p. 276 they say: "It was decided by the highest court in South Carolina, after much discussion and deliberation, that parol evidence even of the person who drew the will, and who was of unimpeachable character, when offered to support the allegation of a mistake in the will and to prove that the testator intended to dispose of the property in a manner not apparent on the face of the will, was not admissible: Rothmaler *v.* Myers *et al.*, 4 Dessaus. 215. Where there is a complete and plain will in writing it cannot be altered or influenced by parol evidence as to the intention: 2 P. Wms. 421. Evidence as to matters *dehors* the will to show the mistake is insufficient: 2 Atk. 373. Even the *instructions for the will are inadmissible to show a mistake:* 2 Ves. & Beames 318; 1 Mad. Ch. 81."

The same doctrine is enunciated by Chief Justice Shaw, in Tucker and others, Executors, *v.* Seamen's Aid Society, and others: 7 Metcalf 188, 204:—

"If, therefore, it could be proved by a dozen witnesses, beyond all doubt, that a man intended to make a will and give his pro-

perty in a particular way and to give nothing more, and gave instructions to have a will to that effect written, but before it could be written he was suddenly killed, it could not take effect. So, if he in fact, executed a will in which a legacy was omitted, that was intended to be given expressed in the written instructions and proved by the testimony of the scrivener and the production of the minutes. So where a bequest is inserted, but the name or description of the legatee is left blank. In the one case, it would be to establish by parol evidence a testamentary bequest, which the law declares to be void, unless in writing, and witnessed; in the other it would give greater weight to an unexecuted memorandum or to *viva voce* testimony, than to an instrument formally executed, and would equally violate the statute requiring the execution of a will to be attested before it can take effect as such."

The same rule was reiterated by the same learned judge in Osborne *v.* Varney and others, Id. 301.

" It seems perfectly agreed," says Judge Redfield, " that parol evidence is not admissible to supply any omission or defect in a will which may have occurred through mistake or inadvertence :" 1 Redfield on Wills 498. " This subject is a good deal discussed in a carefully considered opinion by Mr. Justice Cowen, and the following view adopted: " The rule that the failure of part is fatal to the entire instrument; that the intent of the testator, the soul of the will, is indivisible; that the whole must be effectual, or its identity is lost, and it can no longer be known or traced by the law, would operate as a sentence of nullity against the more important class of wills." We apprehend that unless the result was brought about by fraud and deception, it would be difficult to define any clear basis upon which courts of equity could interfere to set aside a will, because some of its provisions could not be carried into effect according to the intent of the testator, or because others, by accident, or mistake, were wholly omitted :" Id. 500.

Mr. Jarman, in his valuable Treatise on Wills, vol. 1, p. 379, ch. 13, 3d ed., says: " As the law requires wills both of real and personal estate (with an inconsiderable exception) to be in writing, it cannot consistently with this doctrine permit parol evidence to be adduced, either to contradict, vary, add to or (subtract from) the contents of such will; and the principle of this rule demands an inflexible adherence to it, even where the consequence is the partial or total failure of the testator's intended disposition; for it would have been of but little avail to require that a will *ab origine* should be in writing, or to fence a testator round with a guard of attesting witnesses, if, when the written instrument failed, to make a full and explicit disclosure of his scheme of disposition, its deficiencies might be supplied, or its inaccura-

cies corrected, from extrinsic sources. No principle connected with the law of wills is more firmly established, or more familiar in its application, than this."

" So in the case of Brown *v.* Selwin (which is a leading authority), where the testator having bequeathed the residue of his personal estate to two persons, whom he appointed his executors, and one of them was indebted to him by bond, it was attempted to be proved by the evidence of the person who drew the will, that he received the testator's written instructions to release the bond-debt by the will, but that he refused to do so, under the impression that the appointment of the obligee extinguished the debt. Lord Talbot held the evidence to be inadmissible, and his decree was affirmed in the House of Lords:" Id. 380.

" *A fortiori*, parol evidence is not admissible to supply any clause or word which may have been inadvertently omitted by the person drawing or copying the will:" Id. 382.

The case of Newburgh *v.* Newburgh, which is cited by Mr. Jarman to this point, is reported by Lord Chief Justice Tindal in Miller *v.* Travers, 8 Bing. 254 (21 E. C. L.), as follows: " But the case of Newburgh *v.* Newburgh, decided in the House of Lords on the 16th June 1825, appears to be in point with the present. In that case the appellant contended that the omission of the word ' Gloucester' in the will of the late Lord Newburgh proceeded upon a mere mistake, and was contrary to the intention of the testator at the time of making his will, and insisted that she ought to be allowed to prove as well from the context of the will itself, as from other extrinsic evidence, that the testator intended to devise to her an estate for life, as well in the estates in Gloucester, which was not inserted in the will, as in the county of Sussex, which was mentioned therein.

" The question whether parol evidence was admissible to prove such mistake, for the purpose of correcting the will, and entitling the appellant to the Gloucester estates, as if the word ' Gloucester' had been inserted in the will," was submitted to the judges, and Lord Chief Justice Abbott declared it to be the unanimous opinion of those who had heard the argument, that it could not. In this case the mistake was clearly proved. In Miller *v.* Travers, 8 Bing. 244, where the Lord Chancellor (Brougham) was assisted by the Lord Chief Justice of the Common Pleas, Sir Nicholas Tindal, and by the Lord Chief Baron of the Exchequer, Lord Lyndhurst, the same rule was laid down. Chief Justice Tindal, delivering their joint opinion, said, p. 250: " If such evidence is admissible to introduce a new subject-matter of devise, why not also to introduce the name of a devisee altogether omitted in the will. If it is admissible to *introduce* new matter of devise, or a new devisee, why not to *strike out* such as are contained in the executed will? The effect of such evidence in either case would

[Wallize v. Wallize.]

be that the will, though made *in form* by the testator in his life-time, would *really* be made by the attorney (witness) after his death; that all the guards intended to be introduced by the Statute of Frauds would be entirely destroyed, and the statute itself virtually repealed."

In Andress *v.* Weller, 2 Green's Ch. Reports (N. J.) 604, the ordinary, Chancellor Vroom, held that an omission made by a scrivener in preparing a will of real estate cannot be supplied by parol evidence.    Vice-Chancellor Wigram, in his celebrated examination of the rules of law respecting the admission of extrinsic evidence in aid of the interpretation of wills, 4th ed., in § 121, p. 99, says: " Thus it has been laid down (either in dictum or decision), that evidence is inadmissible for the purpose, 1, of filling up a total blank in a will; or 2, of inserting a devise omitted by mistake."

In Birks *v.* Birks, 34 L. J. R. Prob. 92, Sir J. P. Wilde said: " I quite admit that it is beyond the power of the court to supply an omission in a will by parol evidence, for by so doing it would give the force of a testamentary act to parol evidence, contrary to the Wills Act.    If this case came within that rule, it would be impossible for the court to supplement the will by inserting the omissions, but it is not so."

In Mitchell and another *v.* Gard and another, 32 L. J. R. Prob. p. 132, Sir C. Cresswell said: " As far as this question is concerned, I think it makes no difference whether the legacies were omitted by accident or intentionally, nor can it make any difference that Gard remembered the legacies, and knew that she had forgotten them.    But although the will was executed by her intending that it should be her will, if her execution of it had been obtained by fraud, the case would be different."

In Guardhouse *v.* Blackburn, 35 L. J. Rep. Prob. 116, Sir J. P. Wilde, after speaking of the effect of the Wills Act, declaring no will shall be valid unless executed in a certain manner, obviously excluding the probate of unexecuted instructions altogether, says: " But then comes the question, if the court cannot now, as it could before the statute, give effect to any provision omitted by mistake from the will, does it still retain the power to strike out any portion of the contents of a duly executed paper on the ground that, although such portion formed part of the papers when executed by the testator, it was inserted or retained by mistake or inadvertence?"    In that particular case he conceived it to be beyond his power.

It is clear, then, that the court was in error in instructing the jury that if the omission of *any* of the names of any of his children, who the testator intended should have part of his property, was the inadvertence, oversight or intention of Esq. Barr, then the will ought to be set aside.    There was no allegation of

[Wallize *v.* Wallize.]

fraud or deception or undue influence, and the facts clearly show that there was none ; nor was there any perceivable interest in the scrivener to defeat the real intentions of the testator. The account of Esq. Barr is clear and consistent, as we have already said, and shows why the omitted children were not included in the will.

Judgment reversed, and a <em>venire de novo</em> awarded.