## Hoffmann Estate

*Michael A. Hanna* and *Valera Grapp*, for proponent.
*Houston and Houston,* for contestants.

BOYLE, P. J., February 11, 1958.—The case at bar is a will contest involving an appeal from the order of the Register of Wills of Allegheny County entered May 3, 1956, admitting to probate a paper writing dated December 19, 1955, as the last will and testament of the above named decedent and granting letters testamentary thereon to Mrs. Edward Hoffmann Grapp, proponent of the will who is a niece by marriage of decedent. Appellants, who are contestants of the purported will, are Helen G. Stengle and Elizabeth H. Gettman, nieces by blood of decedent. In their petition sur appeal contestants aver that testatrix lacked testamentary capacity when she signed the purported will and that the execution of the writing was procured by the fraud and undue influence of proponent who stood in a confidential relationship to testatrix. At the hearing it was also alleged that the writing was not proven by the testimony of two witnesses as required by section 4(a) of the Wills Act of April 24, 1947, P. L. 89. These allegations are denied in the answer filed by proponent.

Testatrix died on April 29, 1956, leaving to survive her as her heirs at law a nephew, Theodore Grapp, two nieces, Helen G. Stengle and Elizabeth H. Gettman, contestants, a grandniece, Valera Grapp, and two great-grandnieces, Charlotte Lucille Siminatis and Sarah Antonia Siminatis, minors who are represented

in this proceeding by the guardian of their estates. Proponent of the will is the widow of Edward Hoffmann Grapp, a nephew of testatrix. Valera Grapp is a daughter of proponent. The two Siminatis minors are grandchildren of proponent.

In paragraph "Third" of the purported will proponent is bequeathed a specific legacy of 808 shares of the capital stock of the J. M. Hoffmann Company. According to the inventory which has been filed this legacy has a value of $195,334.00. It is bequeathed free of ". . . all inheritance taxes . . ." under the provisions of paragraph "First" of the will. Under paragraph "Fourth" of the purported will the residue of the estate, after payment of debts, funeral expenses and all inheritance taxes is to be distributed as follows:

| | |
|---|---|
| "Theodore Grapp | One-Fourth (¼) |
| Helen Grapp | One-Fourth (¼) |
| Elizabeth Goettmann | One-Fourth (¼) |
| Valera Grapp | One-Eighth (⅛) |
| Charlotte Lucille Suminatis | One-Sixteenth (1/16) |
| Sarah Antonia Suminatis | One-Sixteenth (1/16)" |

The entire estate of testatrix is appraised at a value of $492,702.12 in the inventory and supplemental inventory which have been filed.

The case came on to be heard. The testimony established that at the time of the execution of the will, viz., 11 a.m. of December 19, 1955, testatrix was 92 or 93 years of age. She was a patient in the Washington Sanitarium and Hospital in Washington, D. C., which she had entered on November 11, 1955. The testimony is that testatrix was ill with a painful abdominal disorder on December 19, 1955, nurses had been assigned, a minimum dose of demerol, a pain-relieving narcotic, had been administered at 6:30 a.m.; the writing was signed at 11 a.m.

Contestants did not produce a witness whose testimony would support a valid finding of lack of testa-

mentary capacity in testatrix on the day, December 19, 1955, and at the time, 11 a.m., when she signed the paper writing which purports to be her will. Dr. Robert A. Hare, the physician who attended testatrix daily from the time of her admission to the hospital in November 1955, until her death in April 1956, was called as a witness by contestants. Excerpts from his testimony show that testatrix knew what she was doing on December 19th. At pages 164, 165 of the official notes of testimony, Dr. Hare testified:

"Q. This condition that she had on December 17, 18 and 19—did you recommend surgery?

"A. We advised that we felt surgery might be necessary.

"Q. What did Miss Hoffmann say?

"A. She did not want surgery.

"Q. Did she want to rely on anybody else's opinion as to whether or not she would have surgery? Not medically, but say from Mrs. Grapp—was she willing to have Mrs. Grapp decide whether she would have surgery? Do you recall talking to her about that?

"A. I think she reserved the decision for herself."

And at page 166:

"Q. Was she able to, for instance, get out of bed during this time?

"A. Yes, sir."

At pages 172, 173, 174, Dr. Hare testified as follows:

"Q. Did these sedatives in any way affect her mental condition or mental operation of her mind?

"A. I think very slightly if at all. She showed a remarkable mental clarity throughout her illness.

"Q. On the day that you talked with her as to whether or not she should have an operation, do you recall the date that was? Was that December 19 or 18?

"A. I couldn't say whether I talked with her the 19th about that for I talked with her for several days dur-

ing the development and existence of that acute condition.

"Q. Did she carry on a long discussion with you, I mean an intelligent discussion?

"A. Quite intelligent.

"Q. What was the condition of her mind during those times? Did she have a keen perceptive mind?

"A. She was quite alert. Did not want to have surgery.

"Q. From your various discussions with her would you say that she had a strong mind? Did she have her own will at all times?

"A. Yes, sir.

"Q. Would you say, Doctor, she had an intelligent knowledge of the nature of things up until the day that she died?

"A. I would say until the day before she died.

"Q. Would that include every day up until the day before she died?

"A. I would say an intelligent knowledge of things, yes.

"Q. Could you give us an opinion as to her memory, what type of memory she had? Did she remember things at all times?

"A. My contact with her she had a good memory.

"Q. You stated, Doctor, that she was in serious condition about December 17, 18, and those days in and about that time, and stated that that condition could have been very serious. Now did it result in any serious condition at all? That is, her digestive obstruction during that period.

"A. Temporary discomfort that she experienced.

"Q. But that was relieved?

"A. That was relieved very shortly afterwards, and normal state prevailed again.

"Q. Would that digestive obstruction, as you called it, affect her mental operations in any way?

"A. Oh, I doubt if it would.

"Q. Was there any time, especially during those weeks there in and around the middle of December, that she wouldn't recognize any individual she had known?

"A. I never saw her fail to recognize any one or fail to recognize me."

And at page 176:

"Q. Then, Doctor, would you state that she had a clear mind and a keen mind and an understanding of things at all times from the day she entered the hospital until the day before she died?

"A. I suppose the time of her greatest illness she might have been a little slower in thought than some other days, but certainly aware of what she was saying.

"Q. You would say she was mentally competent at all times.

"A. I would believe. It appeared so."

Miss Ruth Belden, a trained registered nurse since 1928, was called as a witness by contestants. Miss Belden attended testatrix on the day the will was signed. An excerpt from her testimony is the following at pages 188 and 189 of the official notes:

"Q. In a Supreme Court case in Pennsylvania called the Ash Will, 351 Pa. 317, the Supreme Court defined what they felt was the definition of testamentary capacity. I am going to read that definition to you and ask you whether you feel that Miss Hoffmann on the 19th had all the qualities that the Supreme Court stated should be needed to have a testamentary capacity to make a will, at pages 321 and 322. . . .

"Q. (Continuing) . . . 'A man of sound mind and disposing memory is one who has full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, and intelligent perception and understanding of the disposition he desires to

make of it and of the persons and objects he desires shall be the recipients of his bounty'.

"Would you like me to read that again for you? . . .

"Q. Do you want me to read it again?

"A. Well, I don't think so. I mean you don't have to read it again.

"Q. Do you think she had testamentary capacity on the 19th?

"A. I think she did.

"Q. You think she knew the act she was engaged in?

"A. I think she did. She certainly knew enough that she didn't want surgery."

In addition to the testimony of Dr. Hare and Nurse Belden who were witnesses called by contestants, the testamentry capacity of testatrix is strongly supported by the testimony of Mrs. Hazel Abigail Rickey, a subscribing witness to the will, and that of Mrs. Edward Hoffmann Grapp, proponent, who was called for cross-examination by contestants.

Contestants averred and contended that testatrix was unable to read the contents of the purported will. This allegation is not supported by the testimony. Marion Henderson, a registered nurse for 30 years, who was on duty attending testatrix at the time of the signing of the writing in contest, testified, at page 210 of the official notes of testimony:

"Q. Speaking of blind, was she capable of seeing very well?

"A. Why, she said she couldn't read, but she could read her mail when it came. She always made it out and she'd ask us to read it to her again. But she could see pretty good.

"Q. How about her hearing, how good was that?

"A. Her hearing was not too good. It was poor."

Mrs. Rickey, testatrix' companion, who is a subscribing witness to the will, testified at pages 25, 26:

"Q. Did Miss Hoffmann do any reading while she was there?

"A. Yes; she read newspapers quite a bit.

"Q. She read newspapers quite a bit?

"A. Mm-hmh.

"Q. Did she receive any letters there, or did she answer any letters there?

"A. She received letters from relatives.

"Q. Well, did she answer the letters herself?

"A. I don't remember any that she answered.

"Q. You say she read letters and she read the newspapers?

"A. Yes."

Mrs. Rickey began her employment with testatrix in April 1955, when testatrix lived at the Ruskin Apartments in Pittsburgh. It was on November 11, 1955, that testatrix entered the sanitarium at Washington, D. C. As to testatrix' ability to read, Mrs. Rickey further testified, at pages 28, 29:

"Q. Did she ever fail to recognize any one who came into the room?

"A. She always knew everybody.

"Q. Just before Miss Hoffmann went to the sanitarium did she use her desk at the Ruskin Apartments where she lived?

"A. Oh, yes. She took care—she wrote letters and mailed her letters; she took care of her business every day; has sat up at the desk.

"Q. Could you tell us about how long each day she would spend at her desk?

"A. Sometimes quite a while; sometimes not so long.

"Mr. Houston: When was this? Fix the date.

"Q. Just prior to Miss Hoffmann's going to the sanitarium?

"A. Sometimes she would write a number of letters. I would mail them for her.

"Q. Was that true in October of 1955? In other words, did she do that work in October, 1955, the month before she went to the sanitarium?

"A. She did it until she went to the sanitarium.

"Q. Until the day she went to the sanitarium?

"A. She went there November 11.

"Q. Did Miss Hoffmann do her own banking up until the time that she went to the sanitarium?

"A. Yes, she did.

"Q. Did she write her own checks?

"A. Yes.

"Q. Did she do her own shopping before she went to the sanitarium?

"A. Yes; I went to Krogers with her, and she selected all the foodstuffs.

"Q. When was that? How many days before she went to the sanitarium?

"A. Well, all the time until she went to the sanitarium.

"Q. When was the last time you went to Krogers with her?

"A. I don't just remember the last time. I guess maybe two or three days before.

"Q. Before she went. She did her own shopping?

"A. Yes, she did, and planned the meals, and she helped me cook."

The record also shows that on December 11, 1955, eight days before she signed her will, testatrix wrote a letter in her own handwriting instructing the Ruskin to:

"Please give Mrs. Grapp my mail.—
Thank you
Antonia Hoffmann"

Proof of testatrix' ability to see and write is also shown by exhibits F, G, H, I, being checks dated December 6, 12, 12 and 14 respectively, all signed by testatrix with a legible signature. Exhibit J is testatrix'

lease for her apartment at the Ruskin in Pittsburgh signed by her with a legible hand on January 31, 1956, after the execution of the will. Exhibit K is testatrix' book of account for 1954 and 1955, until November 14, kept by her in her own hand. While testatrix was nearsighted and had cataracts, she was not blind. The evidence is overwhelming that she had the physical ability to read as well as write at the time of the execution of the will. Even Dr. McCaslin, upon whom contestants relied, testified, at pages 565, 566: ". . . All nearsighted people can see well, and she could see as well as any other nearsighted person when she got in the range where she could read."

The court finds that testatrix possessed testamentary capacity, including the physical ability to read and write, on December 19, 1955, at 11 a.m., when she signed the paper writing which purports to be her last will and testament.

At the hearing contestants raised the question that the will was not properly admitted to probate by the register because it had not been "proved by the oaths or affirmations of two competent witnesses" as required by section 4(a) of the Wills Act of 1947. The testimony developed that Mrs. Rickey was the only subscribing witness to the will who was present when testatrix signed it. Mrs. Edward Hoffmann Grapp, proponent, was present at the execution of the writing but she did not testify before the register. However, she did testify fully in the present hearing that the purported will was signed by testatrix in her presence.

The assault of contestants upon the validity of the decree of probate turns on the testimony of Florence K. Meade, the other subscribing witness to the will. It is true that Mrs. Meade was not present when the will was signed by testatrix and, therefore, did not see her sign. The record of probate before the register shows

that Mrs. Meade testified that she was present with testatrix when the will was executed and that she, Mrs. Meade, had signed as a witness in the presence of testatrix. This testimony before the register does not appear in the record interrogatively but is set forth narratively on a printed form. Mrs. Meade testified by deposition in this hearing sur appeal from the decree of probate. While she was not present in court, the transcript of her testimony indicates that she was a candid witness and freely admitted that she was not present when the will was signed. Her explanation appears in pages 67 to 76 of the official notes of testimony. Her testimony is that she did not subscribe the will as a witness until December 26, 1955, after she had been requested to do so by testatrix whom she visited on that day for the purpose of obtaining the signature of testatrix to several powers of attorney which testatrix desired to execute in favor of proponent. After testatrix signed the powers of attorney in her presence, Mrs. Meade went home and subscribed her name to the will as testatrix had directed her.

Mrs. Meade is a resident of Washington, D. C. She is a sister of proponent. Proponent, who had possession of the will, was staying at Mrs. Meade's house and was ill at this time. All of this was known to testatrix. Mrs. Meade testified that when she appeared in person in the probate proceedings before the register of wills he did not ask her about the circumstances attending the execution of the will but asked only if the signature at the end was that of testatrix. She answered affirmatively to the latter question. Mrs. Meade testified in the present hearing sur appeal that in addition to the acknowledgement of the signature to her by testatrix on December 26, 1955, she, Mrs. Meade, knew the signature from her familiarity with it over the years and from the three signatures which she

obtained to the powers of attorney on December 26, 1955.

The original will was not produced to Mrs. Meade when her testimony was taken by deposition in the hearing sur appeal at Washington, D. C. But she saw the will at the time when it was offered for probate and at the time when she subscribed her name as a witness on December 26, 1955.

In addition to the testimony of Mrs. Meade as to the genuineness of testatrix' signature on the will, there is the testimony of two other witnesses who identified the signature as that of testatrix. One of these persons was Mrs. Edward Hoffmann Grapp, proponent, who was present and saw testatrix sign the will. The other witness was Max Schoonmaker, Esq., the scrivener of the will, who testified that he had acted as attorney for testatrix at various times over a 10-year period preceding her death and was familiar with her signature. He identified the signature on the will as that of testatrix.

The hearing in the orphans' court sur appeal from the decree of the register is de novo. See section 744 of the Orphans' Court Act of August 10, 1951, P. L. 1163, as amended; Szmahl's Estate, 335 Pa. 89; Maganuco Estate, 75 D. & C. 247. There is more than sufficient testimony in the record to establish that testatrix signed the purported will on December 19, 1955. The testimony also satisfies the requirement of section 4 of the Wills Act of 1947, as amended, that the will must be proved by the oaths or affirmations of two competent witnesses.

The remaining question to be considered is raised by the allegation of contestants that the execution of the will was procured by undue influence, duress and fraud practiced upon testatrix by proponent at the time of the signing of the instrument when testatrix was suffering from weakness of body and mind. It is

also averred that proponent who is the favored beneficiary under the will stood in a confidential relationship to testatrix.

The proper execution of the will has been proven and the presumed testamentary capacity of testatrix has been confirmed by competent witnesses. The rule as to the proof which must support a charge of undue influence is set forth in King Will, 369 Pa. 523, where the Supreme Court held, at page 531:

"Once proper execution of the will by Mrs. King was shown, there arose the presumption of testamentary capacity and lack of undue influence. The burden was then placed upon the contestants of producing compelling evidence in their effort to upset the will. Undue influence must be established by the manifest weight of the evidence; a mere balancing of proofs is not sufficient: Ross Will, 355 Pa. 112, 114, 49 A. 2d 392; Olshefski's Estate, 337 Pa. 420, 422, 11 A. 2d 487; Wertheimer's Estate, 286 Pa. 155, 160, 133 A. 144; Grubbs v. McDonald, 91 Pa. 236, 241."

The record shows that before the summer of 1953 testatrix was on good terms with her nieces and nephews, viz., Helen Stengle, Elizabeth Gettman, Theodore C. Grapp and Edward Hoffmann Grapp, late husband of proponent who died in December 1953. In the summer of 1953 friction developed between Helen Stengle, Elizabeth Gettman, contestants of the will, Clarence M. Gettman, husband of Elizabeth, and Theodore Grapp on the one hand and testatrix, Antonia Hoffmann, on the other. After the death of Edward Hoffmann Grapp, a nephew of testatrix, his widow, the proponent, succeeded to his stock interest in the Hoffmann Company and supported testatrix in her dispute with the other members of the family. The beginning of this family controversy was the result of a desire of Helen Stengle, Elizabeth Gettman and her husband

Clarence, and Theodore Grapp to sell the J. M. Hoffmann Company piano business and the building at 537 Wood Street, Pittsburgh, to one George Schroeder.

Testatrix had a strong sentimental attachment to the J. M. Hoffmann Company which was a family business founded by her father over 90 years ago. Testatrix served as president of the company from 1937 until September 15, 1955, when she was removed by Theodore Grapp and Clarence Gettman, husband of one of the contestants, acting as a majority of the board of directors She was strongly opposed to the sale of the business as proposed by the other stockholders named above, two of whom are contestants in this proceeding. Another provocation of ill feeling was the fact that the board of directors of the company allowed its 50-year charter to expire without having it renewed before the expiration date. The charter was later amended to provide for the corporation's perpetual existence. Much of the testimony offered by contestants to prove their contention that testatrix was under the domination of proponent is nothing more than a recital of the continuing clashes between the stockholders of the J. M. Hoffmann Company, with contestants and their associates on one side and testatrix and proponent on the other.

As the result of these conflicts within the family a majority of the three members of the board of directors of the J. M. Hoffmann Company caused testatrix to be discharged from her office as president of the company by corporate action taken on September 15, 1955. The disputes developed into a lawsuit at no. 2137, October term, 1955, in the Court of Common Pleas of Allegheny County in which testatrix and two employes of the Hoffmann Company were plaintiffs and Theodore C. Grapp and the J. M. Hoffmann Company defendants. The suit was in equity for the rein-

statement of the two plaintiff employes to the positions from which they had been discharged by a majority of the board of directors consisting of Theodore C. Grapp and Clarence Gettman.

It is significant that the hearing in common pleas court was held on September 20, 1955, three months before the will was signed.

Testatrix was a witness in that proceeding. She testified that she had been president of the J. M. Hoffmann Company since 1937 and that the business had been founded by her father "92 years ago". Her testimony shows that she had a comprehensive knowledge of the business. The quality of her memory was demonstrated by her testimony about places and events in Pittsburgh 85 years ago. Her feelings toward the stockholders, including the two present contestants, who were opposing her wishes as president of the company in the matter of the reinstatement of Mr. Michael and the promotion of Mr. Lake, both of whom were old employes of the company, is shown by the following excerpts from her testimony in the equity suit in the court of common pleas. At page 29 of the official notes of testimony in that suit the following appears:

"Q. The Board of Directors did not fire Mr. Lake? They just did not want him as manager? Is that right?

"A. I don't know—no! They're fighting to break it up. They're fighting to break up the J. M. Hoffmann Company!" and at page 33:

"Q. You knew their wishes, but you didn't agree with them?

"A. Their wishes are nothing but rotten wishes to destroy the J. M. Hoffmann Company, the oldest piano house in the city."

The hearing in the equity suit in the common pleas court was held five days after Messrs. Theodore Grapp and Clarence Gettman, acting as a majority of the

board of directors of the J. M. Hoffmann Company, had removed testatrix as president of the company.

The result of the contention among the stockholders of the company was that in February 1956, the J. M. Hoffmann Company purchased the stock of contestants and their associates for a price of $292.25 per share or an aggregate sum of $318,552.50. On February 26, 1956, over two months after the execution of the will, testatrix signed a general release in favor of all the other stockholders of the J. M. Hoffmann Company. This release was signed in the hospital room in Washington.

The testimony portrays testatrix as a dominant personality. She was a spirited old lady who kept up her interest in the family business even to the point where she fought for her policies in an equity action when she was 92 years of age. In the answer to testatrix' complaint in that suit she was described as "quarrelsome, . . . harasses the majority of the board of directors, . . . makes accusations . . . which are provocative", etc. It was averred that: "The conduct of said Antonia Hoffmann is injurious to the business of the J. M. Hoffmann Company and its operations". She was not a person who was easily influenced or persuaded. She was an unmarried lady who had successfully managed her own affairs during a long life and had accumulated a large estate. She was an independent, strong willed and effective person. As one reads the record he is impressed with the strong desire of testatrix to have the business of the J. M. Hoffmann Company continued. Against the factual background of the family conflicts, which began in 1953, resulting in the removal of testatrix as president of the company in September 1955, it can not be argued convincingly that the will of testatrix made on December 19, 1955, is either illogical or unnatural.

The record is barren of evidence or testimony which would be legally sufficient to support a finding by the court that the will was executed by testatrix as the result of undue influence practiced upon her by proponent, Mrs. Edward Hoffmann Grapp. Undue influence is defined in King Will, supra, at page 530, as follows:

"Undue influence of the kind which will affect the provisions of a will must be such as subjugates the mind of the testator to the will of the person operating upon it; and in order to establish this, proof must be made of some fraud practiced, some threats or misrepresentations made, some undue flattery, or some physical or moral coercion employed, as to destroy the free agency of the testator; and these influences must be proved to have operated as a present constraint at the very time of making the will: Cressman Estate, 346 Pa. 400, 31 A. 2d 109; Geho's Estate, 340 Pa. 412, 17 A. 2d 342; Phillips' Estate, supra; Morrish Estate, 156 Pa. Superior Ct. 394, 40 A. 2d 907."

The record in the case at bar presents a testatrix who not only possessed testamentary capacity but one who was strong minded, strong willed, independent in her courses of action and able in business. She may have been dependent in a physical sense in the last months of her life because of her great age and physical debility but, as her personal attending physician testified, "she had an intelligent knowledge of the nature of things until the day before she died." Contestants failed to prove that the execution of the will was procured by undue influence.

Contestants charge that proponent stood in a confidential relationship to testatrix and, therefore, the law casts upon her the burden of proving that the execution of the will was free from undue influence. A broad definition of confidential relationship appears in Kees v. Green, 365 Pa. 368, 374-375, where the Supreme Court held:

348

" '. . . "Confidential relation is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an over-mastering influence, or, on the other, weakness, dependence or trust, justifiably reposed; . . . In some cases the confidential relation is a conclusion of law, in others, it is a question of fact to be established by the evidence": [citing cases] "A confidential relationship . . . exists wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest": Drob v. Jaffe, 351 Pa. 297, 300, 41 A. 2d 407, 408.' "

The evidence in the case at bar does not begin to measure up to what would be required to show a confidential relationship between testatrix and proponent. Proponent had no "overmastering" influence over testatrix who was far from dependent or weak in mind. Although proponent was close to testatrix in a personal way, assisted her in carrying out her policies in the J. M. Hoffmann Company and became her attorney in fact as to her bank accounts after the will was executed, yet there is nothing in these relationships which would warrant a conclusion that proponent stood in such a position of trust or confidence to testatrix of the character which would require her to prove that she did not unduly influence testatrix in the making of the will. Even if it were conceded that a confidential relationship existed, there is no evidence that the testatrix had a weakened intellect at the time of the execution of the will. In such a case the rule of law is as stated in King Will, supra, page 529:

"Where there is no evidence of weakened intellect, the burden is upon those asserting undue influence to prove it, even where the bulk of the estate is left

to one occupying a confidential relation. Ash Will, 351 Pa. 317, 41 A. 2d 620; Phillips' Estate, 244 Pa. 35, 44, 90 A. 457; Lawrence's Estate, 286 Pa. 58, 132 A. 786."

Proponent of the will did not procure the preparation of the will. The writing was prepared by Max Schoonmaker, Esq., who had acted as lawyer for testatrix in various legal matters over a period of 10 years. Testatrix consulted him first on August 31, 1955, about the making of her will. She discussed the matter with him again on September 20, 1955, which was the date of the hearing in the equity suit in the court of common pleas. The scrivener was her lawyer in that proceeding. A third consultation about the preparation of the will took place between the scrivener and testatrix in "early November" 1955, between the 1st day and the 11th day of that month. At this November meeting, which took place in the home of proponent but out of proponent's presence, only the scrivener and testatrix were present. The scrivener took notes at this conference and later prepared the will in accordance with the instructions given him by testatrix. On November 11, 1955, testatrix left Pittsburgh to enter the hospital in Washington, D. C. The later sequence of events is that in December, testatrix directed proponent to go to Pittsburgh, get the will from the scrivener and bring it to Washington so it could be signed by her. The subsequent events are all recited hereinabove.

Contestants assert that the testimony proves that proponent fraudulently procured the preparation and execution of the will; that the scrivener and proponent were conspirators in a dark plot to deprive contestants of their lawful rights. This contention is not supported by the evidence.

Contestants have failed to meet the burden of proof which the law imposes upon them.

The appeal from the decree of probate will be dismissed.

*Decree*

Before Boyle, *P. J.*, Cox and Rahauser, *JJ.*

PER CURIAM, May 27, 1958.—And now, May 27, 1958, after argument heard and upon further consideration of the above entitled case, it is ordered, adjudged and decreed that the exceptions filed by contestants to the decree of the trial judge entered February 11, 1958, be and the same are hereby dismissed.

*Opinion sur Exceptions*

Before Boyle, *P. J.*, Cox and Rahauser, *JJ.*

BOYLE, P. J., May 27, 1958.—The exceptions filed by contestants to the decree of the hearing judge aver, inter alia, that the scrivener did not prepare the will in accordance with the instructions given him by testatrix. It is charged that testatrix did not instruct the scrivener to exonerate the legacy bequeathed to proponent in paragraph "Third" of the will from ". . . any and all inheritance taxes . . ." as the language of paragraph "First" of the will provides. Contestants assert that the language in paragraph "First" of the will directing the payment of ". . . any and all inheritance taxes . . . out of my estate" was inserted by the scrivener although no proof of this allegation was offered and no cross-examination of the scrivener on this point was attempted at the hearing. Contestants now undertake to support this contention in their brief by excerpts from the context of the scrivener's testimony. But reference to page 470 of the official notes of testimony shows that the scrivener testified unequivocally as follows:

"Q. I show you this will and ask you to read the provisions in it?

"A. Yes, I have read it.

"Q. Does the will contain the exact provisions for distribution as dictated to you by Miss Hoffmann before her death?

"A. Yes, it does."

The hearing judge found and concluded that there was no fraud or undue influence involved in the preparation or execution of the will and that testatrix possessed testamentary capacity. The testimony also clearly established that testatrix read the will before signing it.

The general rule is that proponent does not have the burden of proving that testatrix read the will and was familiar with its contents. Proof of execution of the will raises the presumption that testatrix knew its provisions. It is only in the cases where fraud or undue influence is charged and *proved* that affirmative evidence of testatrix' knowledge of the contents of the will is necessary: Ligo v. Dodson, 301 Pa. 124; White's Estate, 262 Pa. 356; Spence's Estate, 258 Pa. 542; Lillibridge's Estate, 221 Pa. 5; Blume v. Hartman, 115 Pa. 32; Dickinson v. Dickinson, 61 Pa. 401; Vernon v. Kirk, 30 Pa. 218.

The law has ever had its cannon fixed against reformation of wills by parol. Even if the provision for the exoneration of proponent's legacy from inheritance taxes had been inserted by the scrivener by mistake, it could not be rectified by parol evidence nor could the will be set aside as void in the absence of fraud: Wallize v. Wallize, 55 Pa. 242; Secondino Estate, 4 Fiduc. Rep. 337.

For these reasons and those expressed in the opinion of the hearing judge the exceptions filed by contestants will be dismissed.